**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

IMANI HATCHER, DE'ANGELO LANSDOWN, ELVIN COLEMAN, DE'QUAN HUGHES, DERRICK REED JR., JOSEPH MURPHY, AARON AMBS, LAJUANE GRIGSBY, JENNARA WISE, JEANETTE CHAPMAN, AVANELL JACKSON, NICKOLAS MORRISON, MICHAEL LOVE, THERMON ATKINS, JACRISHA JOHNSON, CLARISSA WALTON, JANARIC HARPER, DEONTE JAMES, ERICA WRIGHT, MARY KELLY, JAMES GORRELL, WON JEWEL SNELL, DARIN SMITH, JENNIE HAYWARD, DIANA LYNN BUFFEY, CHRISTINA PANTOJA, JORDAN TARRENCE, DEVIN SMITH, RORY DIXON, DUSTIN DADY, DONTA BREED JR., JUSTIN OBRYAN, SHANICE BAILEY, STEFAN FELTON, UTESHA TAYLOR, GENETHA TAYLOR, KELVIN COBB, LARRY BROWN, STACY LONGRIE, JEREMY TYREE, SIMON GREENLICK, LESHAWN SANDERS, GARY HILL, RICHARD LAWRENCE, CLEE COOPER, MICHAEL SWEET, CHALITA CRUMP, DAJUAN MUNERLYN, LAURA HAYWARD, MAURICE RICE, BRIDGETT MANCOUR, BRETT ALLEN ANDERSON II, ALICIA MITCHELL, JEFFERY JONES, REBECCA GAGNON, ERIK GAITHER, ERIN MIDDLETON, SAMANTHA RUPP, CHRISTINA STEVENS-IVORY, D'MONDRE WRIGHT, CODY ARWOOD, TRE-QUAN MARSHALL, ERIC MORRIS-LESTER, TRAVIS LANE, MICHAEL CLACK, KENTAY COLES, DONALD SCOTT, SENECCA HARDEN, KEIVON POWELL, SANIKA WILLIAMS, CHRISTAL MCCAA, JORDAN SHEALEY, RANDALL DETAMORE, ARRON WARSON, RAYNA MILLER MCKAY, MERCEDES BARAJAS, CORTEZ TURNER, TARENCE MARSHALL, SAMUEL BURCH, JAMES BROWN, CARRIE K. VENABLE, DERRICK WALTON JR., NORAH

Case No.

Hon.

HOWELL ANN, DEIDRA MYERS, CHRISTOPHER ADAMS, BRADLEY SHARP, FERONDA SMITH, STEVEN HEBEL, DOUGLAS LONG, BRIAN BROCHU, A'SHIAYA ARKWRIGHT, MAEGAN DAWSON,

     *Plaintiffs*,

v.

COUNTY OF GENESEE, a municipal sub-unit of the State of Michigan; SHERIFF ROBERT PICKELL, Individually and in his official capacity as Sheriff of Genesee County; CAPTAIN JASON GOULD, Individually and in his official capacity as Jail Administrator of the Genesee County Jail,

     *Defendants*.

_____/

| EXCOLO LAW, PLLC | Law Offices of Conrad J. Benedetto |
|---|---|
| Solomon M. Radner (P73653) | Conrad J. Benedetto, Esq. |
| *Attorneys for Plaintiffs* | *Attorneys for Plaintiffs* |
| 26700 Lahser Road, Suite 401 | 1615 S. Broad Street |
| Southfield, Michigan 48033 | Philadelphia, PA 19148 |
| (866) 939-2656 | (215) 389-1900 |
| sradner@excololaw.com | cjbenedetto@benedettolaw.com |

Marc J. Bern & Partners, LLP
Marc J. Bern, Esq.
Ryan Sharp, Esq
*Attorneys for Plaintiffs*
60 E 42nd St, Suite 950
New York, NY 10165
(800) 529-5432
rsharp@bernllp.com

_____/

## COMPLAINT AND JURY DEMAND

NOW COME Plaintiffs, by and through their attorneys, SOLOMON M. RADNER and EXCOLO LAW PLLC, and for their Complaint respectfully allege the following:

## INTRODUCTION

1. This case arises from the poisoning of Plaintiffs, inmates of the Genesee County Jail, with lead from Flint's pipes and services lines, after Defendants participated in switching the City of Flint's drinking water supply to the Flint River, without the use of any corrosion control.

2. In 2014, Defendants discovered that dangerous levels of lead were leaching into Flint's drinking water. Defendants failed to take any measures to eliminate this danger, as required by federal law, and took affirmative steps to downplay the severity of the contamination from its citizens. In doing so, Defendants evidenced a deliberate indifference to Plaintiffs' devastating and irreversible health problems.

3. Plaintiffs seek recovery from Defendants for injuries, damages, and losses suffered by Plaintiffs as a result of their exposure to lead and other toxic substances from Defendants' ownership, use, management, supervision, storage, maintenance, disposal, and/or release of highly corrosive water from the Flint River into the drinking water of the Genesee County Jail.

4. The actions of the City of Flint, Genesee County, and the State of Michigan, along with their agencies, employees, and agents inflicted immeasurable

harm on Plaintiffs amounting to a violation of Plaintiffs' constitutional rights. Plaintiffs were specifically harmed by Defendants, who provided only lead-water to the inmates, despite knowing the water was lead-water.

5. The injuries to Plaintiffs resulted from the policies and/or practices of the Genesee County.

6. The individually named Defendants, Sheriff Robert Pickell and Captain Jason Gould, acting for the county under color of law, deprived Plaintiffs of their constitutional rights.

7. Defendant Genesee County provided the individually named Defendants with the authority and/or enhanced their ability to cause Plaintiffs' injuries.

8. The individually named Defendants' conduct was so dominated by governmental authority that the individual Defendants must be deemed to act with the authority of the government.

9. Plaintiffs bring this action for damages against those Defendants named in their individual capacities who acted under color of law depriving Plaintiffs of their constitutional rights.

10. The health effects of lead poisoning are well known. Lead impacts nearly every organ and system in the human body and causes a variety of serious injuries to the nervous system, which can lead to convulsions, coma and brain death. Lead causes learning and behavioral disorders, memory loss, nausea, anemia, hearing loss, fatigue, colic, hypertension, and myalgia.

11.     As a direct and proximate result of Defendants' deliberate indifference and conspiracy, Plaintiffs were directly exposed to hazardous and toxic substances known to cause disease, and this exposure caused or contributed to Plaintiffs' injuries. Therefore, the doctrine of joint and several liabilities should be extended to apply to each Defendant herein, in their individually capacities.

12.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered injuries and currently suffer and will continue to suffer damages and losses which include, but are not limited to, physical and psychological injuries, learning and other permanent disabilities, pain, mental anguish, emotional distress, the loss of household services, the cost of medical, educational and rehabilitation expenses and other expenses of training and assistance, and loss of earnings, income, and earning capacity. Such injuries, damages and losses are reasonably likely to continue to occur in the future.

## **PARTIES**

13.     Plaintiffs, IMANI HATCHER, DE'ANGELO LANSDOWN, ELVIN COLEMAN, DE'QUAN HUGHES, DERRICK REED JR., JOSEPH MURPHY, AARON AMBS, LAJUANE GRIGSBY, JENNARA WISE, JEANETTE CHAPMAN, AVANELL JACKSON, NICKOLAS MORRISON, MICHAEL LOVE, THERMON ATKINS, JACRISHA JOHNSON, CLARISSA WALTON, JANARIC HARPER, DEONTE JAMES, ERICA WRIGHT, MARY KELLY, JAMES GORRELL, WON JEWEL SNELL, DARIN SMITH, JENNIE HAYWARD, DIANA LYNN BUFFEY,

CHRISTINA PANTOJA, JORDAN TARRENCE, DEVIN SMITH, RORY DIXON, DUSTIN DADY, DONTA BREED JR., JUSTIN OBRYAN, SHANICE BAILEY, STEFAN FELTON, UTESHA TAYLOR, GENETHA TAYLOR, KELVIN COBB, LARRY BROWN, STACY LONGRIE, JEREMY TYREE, SIMON GREENLICK, LESHAWN SANDERS, GARY HILL, RICHARD LAWRENCE, CLEE COOPER, MICHAEL SWEET, CHALITA CRUMP, DAJUAN MUNERLYN, LAURA HAYWARD, MAURICE RICE, BRIDGETT MANCOUR, BRETT ALLEN ANDERSON II, ALICIA MITCHELL, JEFFERY JONES, REBECCA GAGNON, ERIK GAITHER, ERIN MIDDLETON, SAMANTHA RUPP, CHRISTINA STEVENS-IVORY, D'MONDRE WRIGHT, CODY ARWOOD, TRE-QUAN MARSHALL, ERIC MORRIS-LESTER, TRAVIS LANE, MICHAEL CLACK, KENTAY COLES, DONALD SCOTT, SENECCA HARDEN, KEIVON POWELL, SANIKA WILLIAMS, CHRISTAL MCCAA, JORDAN SHEALEY, RANDALL DETAMORE, ARRON WARSON, RAYNA MILLER MCKAY, MERCEDES BARAJAS, CORTEZ TURNER, TARENCE MARSHALL, SAMUEL BURCH, JAMES BROWN, CARRIE K. VENABLE, DERRICK WALTON JR., NORAH HOWELL ANN, DEIDRA MYERS, CHRISTOPHER ADAMS, BRADLEY SHARP, FERONDA SMITH, STEVEN HEBEL, DOUGLAS LONG, BRIAN BROCHU, A'SHIAYA ARKWRIGHT, and MAEGAN DAWSON, were at all relevant times inmates of the Genesee County Jail in the City of Flint and connected to Flint's water system. Plaintiffs were exposed to extremely high levels of lead due to the deliberate

actions of the Defendants, having bathed in and consumed lead contaminated water. All Plaintiffs reside in Genesee County and are domiciled within the jurisdiction of the Eastern District of Michigan.

14.     As a result of Defendants' deliberate actions, Plaintiffs have suffered injuries including but not limited to: various health problems (including, without limitation: hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits, lost earning capacity, aggravation of pre-existing conditions, and contract damages.

15.     Defendant GENESEE COUNTY is a Michigan municipal corporation and is responsible for maintaining the Genesee County Jail.

16.     Defendant SHERIFF ROBERT PICKELL (hereafter "Pickell") was at all times relevant, the Sheriff of Genesee County and responsible for the operation of the Genesee County Jail. At all times relevant Pickell acted within the course and scope of his employment and/or authority under color of law. He is sued herein in his individual and official capacities. At all relevant times, Pickell knew that inmates of the Genesee County Jail, including Plaintiffs, were being exposed to lead contaminated water. As sheriff, Pickell was ultimately responsible for the operations of the Genesee County Jail and is tasked with ensuring that inmates are not subjected to unconstitutionally inhumane conditions. In a deliberately indifferent manner, Pickell participated in,

approved of, and/or assented to the decision to allow Flint's water to be delivered to Plaintiffs without corrosion control or proper study and/or testing. Further, Defendant Pickell failed to ensure that inmates were provided with clean water, bottled or otherwise, in a timely and consistent manner. Defendant Pickell knew that the Genesee County Jail was providing inmates with contaminated water and prohibited Plaintiffs from using any clean water that was delivered to them. Put another way, Defendant Pickell forced Plaintiffs to drink contaminated water and refused to give them access to clean water. Defendant Pickell violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger. Defendant Pickell's actions evidence deliberate indifference to whether an injury resulted to Plaintiffs.

17.    Defendant CAPTAIN JASON GOULD (hereafter "Gould") was at all times relevant Jail Administrator of the Genesee County Jail and acted within the course and scope of his employment and/or authority under color of law. He is sued herein in his individual and official capacities. At all relevant times, Gould knew that inmates of the Genesee County Jail, including Plaintiffs, were being exposed to lead contaminated water. In a deliberately indifferent manner, Gould participated in, approved of, and/or assented to the decision to allow Flint's contaminated water to be delivered to Plaintiffs without corrosion control or proper study and/or testing. Further, Defendant Gould failed to ensure that inmates were provided with clean water, bottled or otherwise, in a timely and consistent manner. Defendant Gould knew that the Genesee County Jail was

providing inmates with contaminated water and prohibited Plaintiffs from using any clean water that was delivered to them. Put another way, Defendant Gould forced Plaintiffs to drink contaminated water and refused to give them access to clean water. Defendant Gould violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger. Defendant Gould's actions evidence deliberate indifference to whether an injury resulted to Plaintiffs.

18.     Through its Department of Public Works, Flint distributes water to the Genesee County Jail and its inmates, and the Defendants knew that.

19.     When Flint Emergency Manager Darnell Earley, as the City's ultimate policymaking authority, made the decision, on behalf of the State of Michigan and the City, to rush the distribution of water from the Flint River without proper treatment, including corrosion control, Plaintiffs were poisoned.

20.     It was the official custom, policy, and/or practice of Defendant Genesee County that led to the violations of Plaintiffs' constitutional rights described herein.

21.     The actions of lower level County employees, not named as Defendants herein, in delivering Plaintiffs unsafe water were constrained by policies not of their own making. Flint's water treatment employees were inadequately trained. Considering the duties assigned to them the need for more training was obvious, and the inadequacy was so likely to result in the violation of constitutional rights that Flint's policy makers can reasonably said to have been deliberately indifferent to the need for additional

training. The County is liable because, through its policy makers, it violated the constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger.

22.     Further, Defendants Pickell and Gould were at all pertinent times supervisors to these lower level subordinates, and at least implicitly approved, acquiesced, or authorized the complained of conduct of their subordinates.

## JURISDICTION & VENUE

23.     This is a civil action for money damages brought pursuant to 42 U.S.C. §1983, and the Eighth and Fourteenth Amendments to the United States Constitution.

24.     This Court has original jurisdiction over Plaintiffs' claims presented in this Complaint based upon the laws of the United States pursuant to 28 U.S.C. §§ 1331 and 1343.

25.     The unlawful actions alleged in this Complaint took place within the jurisdiction of the United States Eastern District of Michigan.

26.     All Defendants reside in this district within the meaning of 28 U.S.C. § 1391(c). This Court has personal jurisdiction over all Defendants because a Michigan state court would have personal jurisdiction under MCL 600.701 and MCL 600.705.

27.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## FACTUAL BACKGROUND

28.     This case arises from the tragic and preventable poisoning of the City of Flint and its residents. The outrageous acts and omissions of the Defendants have caused immeasurable and irreparable harm to Plaintiffs.

29.     The actions of the individually named Defendants, Pickell and Gould, acting under color of law and failing to protect Plaintiffs, and then obscuring their mistakes as Plaintiffs continued to suffer, evidenced a deliberate indifference to Plaintiffs' constitutional rights and denies Defendants the protections of qualified immunity.

30.     As a direct and proximate result of Defendants' actions and/or failures to act, Plaintiffs' constitutional and other rights have been violated and Plaintiffs have suffered serious physical, mental, economic, and emotional injuries.

31.     At all times between December 2011 and April 30, 2015, the City of Flint was under the control and authority of an Emergency Manager appointed by, and serving under the direction of Governor Snyder. Michael Brown served Governor Snyder as Flint's Emergency Manager from December 2011 until August 2012. Ed Kurtz served Governor Snyder as Flint's Emergency Manager from August 2012 until July 2013. Michael Brown again served Governor Snyder as Flint's Emergency Manager from July 2013 until October 2013. Non-Party Earley served Governor Snyder as Flint's Emergency Manager from October 2013 until January 2015. Non-party Ambrose served Governor Snyder as Flint's Emergency Manager from January 2015

until April 30, 2015. Thus, at all relevant times prior to April 30, 2015, Flint's local government was under the control and direction of the State of Michigan.

32.     The MDEQ, as a matter of pattern, practice, custom, and policy, has deliberately failed to adequately protect Plaintiffs from lead contaminated drinking water. In 2010, the EPA commissioned a report that indicated problems with the MDEQ's ability to ensure safe drinking water. The report noted that funding cuts caused important MDEQ staff positions to be filled "with staff from other programs that have been cut or eliminated … while this practice preserves jobs, it decreases the technical knowledge of staff[.]" The report stated that "training for new staff would also be appreciated on fundamental public health issues and compliance decisions." The report also indicated several technical shortcomings with the way the MDEQ regulated the State's drinking water – particularly as it related to lead contamination. The report noted that while federal regulations require water utilities to certify that the drinking water in 90% of homes in each community contain no more than 15 parts per billion ("ppb") of lead, MDEQ had a practice of not even calculating "90th percentiles" unless a potential exceedance had been identified. This "does not meet the requirements of Federal Regulations, since it is required that all 90th percentiles be calculated." The report also noted that MDEQ did not conduct the required number of water samples for lead, allegedly to conserve agency resources. Organizational and individual actions and failures of the MDEQ, such as those illustrated in the report, directly resulted in the Flint catastrophe.

33.     The MDEQ failed to follow the EPA's Lead and Copper Rule ("LCR") in Flint. The EPA is responsible for setting rules under the Safe Drinking Water Act. Enforcement and implementation of those rules is delegated to state environmental agencies – in Michigan, that agency is the MDEQ. The EPA's LCR was enacted to establish protocols to ensure that public water systems do not allow unsafe levels of lead or copper to contaminate their drinking water supply. While failing to protect Plaintiffs, the MDEQ violated both the letter and spirit of the LCR. Specifically, the MDEQ violated the LCR in at least the following ways: failing to require corrosion control for Flint River water from the moment Flint began drawing it; misinforming the EPA about whether corrosion control was being utilized; improperly conducting sampling.

34.     Rather than taking any preventative measures, the MDEQ determined it was sufficient to conduct two rounds of six-month lead sampling, using Flint's residents, including Plaintiffs, as human test subjects in a process of trial and error. The first round of lead sampling was conducted between July and December 2014, and the second between January and June 2015. Despite the sampling procedures being woefully inadequate, even the flawed tests showed rising lead levels in Flint's water.

35.     In conducting the sampling required under the LCR, the MDEQ collected an insufficient number of samples, consistent with MDEQ's pattern, practice, policy, and custom of deliberate indifference to Plaintiffs' well-being. The LCR requires at least 50% of home sampled to be verified as having lead pipes, with the remaining 50%

to have been built before 1986 and known to have lead solder. Flint's data was essentially useless because the MDEQ failed to require that the appropriate number of samples be drawn from these "high risk" homes. Because an insufficient number of samples were taken from a pool of homes that were not properly determined to be "high risk," the City of Flint has not had a valid LCR sampling event since the switch to the Flint River.

36.     The MDEQ, through its former director, has admitted that it did not follow the LCR, and that it should have required corrosion control. Had the MDEQ followed the LCR, it would have required water quality parameters and optimized corrosion control on the Flint River water from the very beginning, which likely would have prevented the public health catastrophe that caused Plaintiffs to suffer injuries and damages. Instead, the MDEQ engaged in a pattern of deliberate indifference and aggressive denial since the City of Flint started drawing water from the Flint river. At all relevant times, MDEQ and its employees insisted, despite overwhelming evidence to the contrary, that Flint complied with water safety regulations.

37.     Under the State's authority, Flint's water supply was switched to the Flint River without the provision of any corrosion control, causing poisonous lead from thousands of pipes to leach into Plaintiffs' drinking water. For decades prior to April 25, 2014, the City of Flint received safe, clean, treated drinking water from the Detroit Water and Sewer Department ("DWSD"). In November of 2012, Emergency Manager Ed Kurtz wrote to Treasurer Andy Dillion suggesting that Flint join the yet-to-be-

formed Karegnondi Water Authority (KWA) due to potential cost savings over DWSD. In April 2013, Dillion gave Kurtz permission to notify the DWSD that it would be terminating service and switching to the KWA in the coming years. On April 16, 2013, Kurtz ordered that Flint would switch its long-term water supplier from the DWSD to the KWA. The KWA depended on an infrastructure that had not yet been built. While waiting for the KWA to come online, the Emergency Manager ordered that instead of temporarily remaining with DWSD, Flint would switch to the Flint River as a temporary source for the City's water.

38.     The temporary use of the Flint river was also designed as a cost-cutting measure. The Flint River was studied for use as a primary water source in a 2011 feasibility report, of which Defendants were aware. At that time, the Flint River was rejected because the costs to prepare Flint's water treatment plant to treat Flint River water to applicable standards were estimated to be in the tens of millions of dollars.

39.     According to the EPA, "it is critical that public water systems, in conjunction with their primary agencies and, if necessary, outside technical consultants, evaluate and address potential impacts resulting from treatment and/or source water changes." Various factors specific to individual water sources necessitate different treatments, including but not limited to the use of chemical additives. Neither the State of Michigan, on its own or through its control over the City of Flint, the MDEQ, or LAN required water quality standards to be set for the Flint River water that would be delivered to Flint's residents, including Plaintiffs. Further, none of the entities required

corrosion control to be implemented to ensure that corrosive water was not delivered throughout Flint's aging water system.

40.    The water obtained from the Flint River was substantially more corrosive than the treated water Flint had been receiving from DWSD. Water becomes more corrosive when it contains greater quantities of chloride, which can enter the water from manmade and natural sources. Flint River water is known to contain approximately eight (8) times more chloride than the treated water that Flint had been receiving from DWSD. It is well known that corrosive water that is not properly treated results in the corrosion of pipes, such that the metals in the pipes, including lead, will leach into drinking water.

41.    Because of the failure to properly treat water from the Flint River, corrosive water was delivered throughout the Flint Water System. The corrosive water predictably corroded metal pipes, causing them to leach into water. The corrosive nature of the water was almost immediately apparent. Soon after the switch, Flint residents began complaining about discolored water – clearly indicating that iron, lead, or other metals were leaching into the water.

42.    It is important that a new source of water be properly studied and treated to ensure that its use will not result in the corrosion of pipes in the delivery system. Setting standards and optimal ranges for water quality is necessary to prevent widespread impacts from substandard or dangerous water. This is particularly important where portions of the delivery system, including but not limited to service lines, are

made of lead. An estimated 15,000 of Flint's 30,000 residential service lines are composed at least partially of lead. Upon information and belief, the Genesee County Jail had its water supplied by service lines containing lead.

43.     Lead exposure causes problems including decreased IQ, behavioral problems, hearing impairment, impaired balance and nerve function, infections, skin problems, digestive problems, psychological disorders, digestive, cardiovascular, and reproductive problems, kidney damage, dizziness, fatigue, weakness, depression and mood disorders, diminished cognitive performance, nervousness, irritability, and lethargy. There is no safe level of lead as its effects are harmful even at low levels.

44.     Lead contamination is not the only problem that is caused when corrosive water is distributed in a public water system. When water corrodes iron pipes, the iron leaching into the water system can consume chlorine. This can eliminate the chlorine necessary to prevent the growth of microorganisms that can cause disease. With chlorine is consumed by iron, the risk of infection by organisms such as legionella increases. Corrosion of iron water pipes is obvious when it occurs, as the water appears discolored. The corrosion of iron pipes can also result in an increase in water main leaks and breaks. The signs of iron corrosion are a warning sign that lead corrosion may also be present, since both are caused by the same phenomenon.

45.     Almost immediately after the water source was changed to the Flint River, signs of trouble with Flint's water quality began to surface. Within weeks, many residents began to complain about odorous, discolored water. As complaints rolled in,

Flint Mayor Walling called the water a "safe, quality product," and claimed that "people are wasting their precious money buying bottled water." In August and September 2014, the City of Flint issued two boil water advisories after fecal coliform bacteria was discovered in the water.

46.     On October 13, 2014, General Motors ceased the use of Flint River water at its engine plant because of fears that it would cause corrosion due to high levels of chloride. Discussing General Motors' decision, Prysby wrote to Busch, Skekter-Smith and others that the Flint River water had elevated chloride levels. He stated that "although not optimal" the water was "satisfactory." He noted that he had "stressed the importance of not branding Flint's water as 'corrosive' from a public health standpoint simply because it does not meet a manufacturing facility's limit for production."

47.     On January 2, 2015, the City of Flint mailed a notice to its water consumers indicating that it was in violation of the Safe Drinking Water Act due to the presence of trihalomethanes, which was a product of attempting to disinfect the water. It was claimed that the water was safe to drink for most people with healthy immune systems.

48.     With the Flint water quality problems now being recognized, on January 12, 2015, DWSD offered to waive a four (4) million-dollar reconnection fee to transition back to DWSD water. Ambrose, as Emergency Manager, declined the offer.

49.     On January 21, 2015, enraged Flint residents attended a meeting at Flint City Hall, bringing jugs of discolored water and complaining about the water's smell and taste.

50.     As early as January of 2015, the State of Michigan provided purified water coolers at its Flint offices in response to concerns about the drinking water, while State employees continued to tell the public that the water was safe to drink.

51.     In a January 29, 2015, email to MDEQ deputy director Jim Sygo, Shekter-Smith made statements indicating her personal knowledge of the Flint River's corrosivity. "I'm theorizing here, but most likely what they are seeing is a result of differing water chemistry. A change in water chemistry can sometimes cause more corrosive water to slough material off of pipes as opposed to depositing material or coating pipes in the distribution system. This may continue for a while until things stabilize. It would be unusual for water leaving the plant to have color like people are seeing at their taps. Generally this is a distribution system problem or a premise plumbing issue. Since it appears wide-spread, it's most likely a distribution system problem."

52.     On February 6, 2015, an Emergency Manager staff member wrote to Prysby, described as the MDEQ's "most knowledgeable staff member on the Flint and Genesee County water supply issues," asking whether he knew if MDEQ had ever conducted a "source water assessment" for the Flint River. After an initial response stating that he did not know, Prysby later responded that a study on the Flint River as

an emergency intake had been conducted in 2004. The 2004 study noted that the Flint River was a highly sensitive drinking water source that was susceptible to contamination, yet apparently even Prysby did not consult it before approving the Flint River as a source.

53.     On February 27, 2015, in response to concerns about extremely high levels of lead in a resident's water sample, Busch told the EPA on behalf of MDEQ that the Flint Water Treatment Plant had an optimized corrosion control program, despite the fact that it did not. MDEQ was required to know whether Flint had an optimized corrosion control program, because ensuring the existence of that program was the express responsibility of MDEQ. MDEQ did, in fact, know that no optimized corrosion control had been implemented, since MDEQ was involved in the decision not to implement corrosion control. MDEQ did not require the use of corrosion control, and it did not set water quality parameters for the Flint River source water, both of which it was required to do. MDEQ's failures resulted in Plaintiffs' exposure to poisonous water that caused a variety of adverse health effects.

54.     On February 27, 2015, the EPA's regional drinking water regulations manager, Miguel Del Toral, began to voice his concerns about the likely cause of the high lead levels detected in Flint. In an email to Prysby that date, which was also copied to Busch, Del Toral attributed those levels to particulate lead, which would mean that the MDEQ's testing methods of "pre-flushing" water from homes was generating

inaccurate results. He also inquired about optimized corrosion control, which he noted Flint was "required to have" in place.

55.    At another point in February 2015, Governor Snyder received a briefing in Flint's water problems from MDEQ Director Dan Wyant, which included resident complaints about discolored, low quality tap water, and a letter from a state representative indicating that his constituents were "on the verge of civil unrest." Snyder took no significant action in response to the Flint residents' pleas – demonstrating his deliberate indifference to the health of Flint residents, including Plaintiffs.

56.    Around the same time, an MDEQ email explained away "hiccups" in the transition to Flint's water system, dismissing the possibility of imminent threats to public health, and noting that the switch to the Flint River "put the city in the business of water production, where they had historically been in the business of water transmission." It was claimed that "once the city connects to the new KWA system in 2016, this issue will fade into the rearview." The MDEQ email also noted that "MDEQ approved the use of river as a source[.]"

57.    In early 2015, nonparty Veolia was hired to conduct a review of the City's water quality, largely in response to citizen complaints. Veolia thereafter conspired with others to declare the water safe – with deliberate indifference to whether the water actually was safe.

21

58.     Veolia's task was to review Flint's public water system, including treatment processes, maintenance procedures, and actions taken. As water treatment professionals, Veolia had an opportunity to correct what LAN had missed or refused to warn about – that corrosive water was being pumped through lead pipes into the homes of Flint residents without any corrosion control.

59.     Veolia issued an interim report on its findings, which it presented to a committee of Flint's City Council on February 18, 2015. In its interim report, Veolia indicated that Flint's water was "in compliance with drinking water standards." It also noted that "safe [equals] compliance with state and federal standards and required testing." Put another way, Veolia publicly declared Flint's corrosive water, which was leaching heavy metals from service lines, safe.  Veolia's interim report also noted that the discoloration in Flint's water "raises questions," but "doesn't mean the water is unsafe." The interim report noted that among Veolia's "next steps" were to "carry out more detailed study of initial findings" and "make recommendations for improving water quality." In response to potential questions about "medical problems," Veolia's interim report dismissively claimed that "some people may be sensitive to any water."

60.     Veolia issued its final "Water Quality Report" dated March 12, 2015. In the final report, Veolia noted that it had conducted a "160-hour assessment of the water treatment plant, distribution system, customer services and communication programs, and capital plans and annual budget." The final report claims that "a review of water quality records for the time period under our study indicates compliance with State and

Federal water quality regulations." The final report states that "the public has also expressed its frustration of discolored and hard water. Those aesthetic issues have understandably increased the level of concern about the safety of the water. The review of the water quality records during the time of Veolia's study shows the water to be in compliance with State and Federal regulations, and based on those standards, the water is considered to meet drinking water requirements." Specifically addressing the lack of corrosion control, the final report notes that "many people are frustrated and naturally concerned by the discoloration of the water with what primarily appears to be iron from the old unlined cast iron pipes. The water system could add a polyphosphate to the water as a way to minimize the amount of discolored water. Polyphosphate addition will not make discolored water issues go away. The system has been experiencing a tremendous number of water line breaks the last two winters. Just last week there were more than 14 in one day. Any break, work on broken valves or hydrant flushing will change the flow of water and potentially cause temporary discoloration."

61.     As a result, in addition to deliberately disregarding and/or concealing the connection between the lack of corrosion control and lead contamination, Veolia made a permissive "could" suggestion aimed only at reducing aesthetic deficiencies while suggesting that Flint's drinking water met all applicable requirements and was safe to drink.

62.     As a result of Veolia's actions, Plaintiffs continued to be exposed to poisonous water beyond February and March of 2015.

63.     As evidence of problems mounted, the State and the MDEQ repeatedly denied the dangers facing Flint's residents, insisting that their water was safe to drink.

64.     On March 23-24, 2015, Flint's City Council voted 7-1 to end Flint River service and to return to DWSD. Ambrose declared that vote "incomprehensible" and rejected the proposal. Ambrose then publicly declared that "Flint water today is safe by all Environmental Protection Agency and Michigan Department of Environmental Quality standards, and the city is working daily to improve its quality … water from Detroit is no safer than water from Flint."

65.     On April 24, 2015, the MDEQ finally admitted to the EPA that Flint did not have optimized corrosion control in place, expressly contradicting its statements from two months prior.

66.     By no later than April 2015, but likely much earlier, Defendants Genesee County, Pickell and Gould were undeniably aware that no corrosion control was being used in Flint following the switch to the Flint River as the water source.

67.     On July 9, 2015, ACLU-Michigan reporter Curt Guyette publicly broke the story about lead in Flint's drinking water, citing Del Toral's Memorandum and exposing the lack of corrosion control in Flint's drinking water.

68.     In an email response to a Governor's office inquiry regarding the high lead levels in residents' homes and the discrepancy between those numbers and the State's test results, Defendant Wurfel stated "don't know what it is, but I know what it's not. The key to lead and copper in drinking water is that it's not the source water, or even

the transmission lines (most of which are cast iron). It's in the premise plumbing (people's homes)." This statement was made despite the facts that about half of Flint's homes are connected to lead service lines, and that it was clear by this point that Ms. Walters's home had plastic plumbing. Wurfel then blamed Del Toral, the ACLU, and others taking action to help Flint's residents, stating: "this person is the one who had EPA lead specialist come to her home and do tests, then released an unvetted draft of his report (that EPA apologized to us profusely for) to the resident, who shared it with ACLU, who promptly used it to continue raising hell with the locals … it's been rough sledding with a steady parade of community groups keeping everyone hopped-up and misinformed."

69.    Dr. Edwards published a report in early September 2015, with startling findings. Among them: "FLINT HAS A VERY SERIOUS LEAD IN WATER PROBLEM;" "101 out of 252 water samples from Flint homes had first draw lead more than 5 ppb;" "Flint's 90th percentile lead value is 25 parts per billion … over the EPA allowed level of 15 ppb that is applied to high risk homes … how is it possible that Flint 'passed' the official EPA Lead and Copper Rule sampling overseen by MDEQ?"; "Several samples exceeded 100 ppb and one sample collected after 45 seconds of flushing exceeded 1,000 ppb."

70.    Additional Edwards findings included that "on average, Detroit water is 19 times less corrosive than the Flint River water currently in use;" "even with

phosphate, Flint River water has 16 times more lead compared to the same condition using Detroit water."

71.     Therefore, the Flint River water was so corrosive that even the obvious, necessary measure of adding corrosion control may not have been enough to make it totally safe.

72.     This would have been known if the water were properly treated or studied before the switch. Instead, by and through the actions of Defendants Genesee County, Pickell and Gould herein, the residents of Flint, including Plaintiffs, were used as test subjects in a "test then treat" scenario that ensured at least one year of absolutely no protection from lead contamination.

73.     A Centers for Disease Control and Prevention ("CDC") employee wrote to Genesee County Health Officials in April of 2015: "we are very concerned about this Legionnaires' disease outbreak… it's very large, one of the largest we know of in the past decade, and community-wide, and in our opinion and experience it needs a comprehensive investigation." That email added "I know you've run into issues getting information you've requested from the city water authority and the MI Dept. of Environmental Quality. Again, not knowing the full extent of your investigation it's difficult to make recommendations, and it may be difficult for us to provide the kind of detailed input needed for such an extensive outbreak from afar."

74.     On December 5, 2015, an employee of Genesee County Health Department accused State officials of covering up their mishandling of Flint's

Legionnaires' disease outbreak. Tamara Brickey wrote to colleagues that "the state is making clear they are not practicing ethical public health practice." Further, "evidence is clearly pointing to a deliberate cover-up," and "in my opinion, if we don't act soon, we are going to become guilty by association."

75.     Finally, after months of denial, deliberate obstruction, and lies, the State began to act on October 12, 2015. Governor Snyder received a proposal to reconnect Flint to DWSD and worked on plans for lead testing and water filters. Still, Governor Snyder's "comprehensive action plan" stated that "the water leaving Flint's drinking water system is safe to drink, but some families with lead plumbing in their homes or service connections could experience higher levels of lead in the water that comes out of their faucets."

76.     Subsequent tests have shown that lead levels in Flint's water have been so high that filters could not remove all lead, meaning that the state's recommendation and distribution of filters as a solution continued to inflict harm.

77.     On October 16, 2015, Flint reconnected to DWSD. However, the damage had been done and lead has continued to leach from pipes into the water.

78.     On December 5, 2015, the City of Flint declared a state of emergency. In response to a blog post by Professor Edwards entitled "Michigan Health Department Hid Evidence of Health Harm Due to Lead Contaminated Water. Allowed False Public Assurances by MDEQ and Stonewalled Outside Researchers," the Governor's Communications Director wrote to Governor Snyder and others "it wasn't until the

Hurley report came out that our epidemiologists took a more in-depth look at the data by zip code, controlling for seasonal variation, and confirmed an increased outside of normal trends. As a result of this process we have determined that the way we analyze data collected needs to be thoroughly reviewed."

79.     On January 4, 2016, Defendant Genesee County declared a state of emergency.

80.     On January 21, 2016, the EPA issued an Emergency Order, based on its finding that "the City of Flint's and the State of Michigan's responses to the drinking water crisis in Flint have been inadequate to protect public health and that these failures continue."

81.     The Emergency Order included as Respondents the City of Flint, the MDEQ, and the Emergency Order provided for the EPA to conduct its own sampling of lead in Flint's water and undertake other actions as part of a process "to abate the public health emergency in the City of Flint."

82.     The Emergency Order notes that "the presence of lead in the City water supply is principally due to the lack of corrosion control treatment after the City's switch to the Flint River as a source in April 2014. The river's water was corrosive and removed protective coatings in the system. This allowed lead to leach into the drinking water, which can continue until the system's treatment is optimized."

83.     The Emergency Order indicates that "water provided by the City to residents poses an imminent and substantial endangerment to the health of those

persons. Those persons' health is substantially endangered by their ingestion of lead in waters that persons legitimately assume are safe for human consumption."

84.     Further, the EPA states that "The City, MDEQ and the State have failed to take adequate measures to protect public health." The County equally failed with regards to the plaintiffs in this action.

85.     According to the Emergency Order: "Based upon the information and evidence, EPA determines that Respondents' actions that resulted in the introduction of contaminants, which entered a public water system and have been consumed and may continue to be consumed by those served by the public water system, present an imminent and substantial endangerment to the health of persons."

86.     In a public statement, EPA Administrator Gina McCarthy declared: "Let's be really clear about why we are here today … we are here today because a state-appointed emergency manager made the decision that the City of Flint would stop purchasing treated water that had well served them for 50 years and instead purchase untreated – and not treat that water – and by law the state of Michigan approved that switch and did not require corrosion control. All to save money. Now that state decision resulted in lead leaching out of lead service pipes and plumbing, exposing kids to excess amounts of lead. That's why we're here."

87.     As the aforementioned facts subjected every resident of Flint to unconstitutionally inhumane conditions, Plaintiffs were subjected to an additional, unique, constitutional violation.

88.     At all times relevant, Plaintiffs were inmates of the Genesee County Jail. Meaning that Plaintiffs could not travel to an area and/or municipality which had uncontaminated water. Further, Plaintiffs had no discretion to install water filters on the water taps in their jail cells or to drink bottled water. Put another way, Plaintiffs lacked their freedom and were completely at the mercy of Defendants Genesee County, Pickell and Gould, and the Genesee County Jail.

89.     Because Plaintiffs, at all times relevant, were incarcerated and could not access clean water in any way, Defendants Genesee County, Pickell and Gould subjected Plaintiffs to a special danger as distinguished from the public at large.

90.     With full knowledge that the water in the Genesee County Jail was contaminated, Defendants Pickell and Gould forced Plaintiffs to continue drinking the contaminated water.

91.     Many of the individually named Plaintiffs attempted to have bottled water delivered to them by un-incarcerated loved ones. However, Defendants Pickell and Gould, along with the employees and/or agents of the Genesee County Jail, prohibited Plaintiffs from accepting the deliveries. Simply put, the Genesee County Jail, through Defendants Pickell and Gould, forced Plaintiffs to ingest contaminants which caused them severe and permanent injuries.

92.     Defendants Genesee County, Pickell and Gould's deliberate indifference to Plaintiffs' health was further exemplified when pregnant inmates at the Genesee County Jail were forced to drink contaminated water.

93.     Further, employees and/or agents of the Genesee County Jail, whom Defendants Pickell and Gould were responsible for, lied to Plaintiffs and told them that the Genesee County Jail had switched back to DWSD water – over a year before that statement was true. Defendants Pickell and Gould knowingly permitted their employees and/or agents to lie to Genesee County Jail inmates to convince them to drink contaminated water.

94.     Eventually, well over a year after Defendants Pickell and Gould were aware that Plaintiffs were being forced to drink contaminated water, the State of Michigan and/or Defendant Genesee County delivered bottled water to the Genesee County Jail. Unfortunately, however, Defendants Pickell and Gould failed to ensure that the bottled water was given to Plaintiffs in a timely or consistent manner.

95.     Employees and/or agents of the Genesee County Jail would knowingly withhold bottled water from Plaintiffs and force Plaintiffs to continue drinking the contaminated water. Defendants Pickell and Gould were deliberately indifferent to the actions of their employees and/or agents and knowingly allowed Plaintiffs to be deprived of their fundamental human rights.

96.     Instead of ensuring that Plaintiffs were given clean water in a timely and consistent manner, Defendants Pickell and Gould arbitrarily and inhumanely rationed Plaintiffs to only two (2) half liter bottles of water a day. Put another way, Plaintiffs were limited to 33.8 ounces of clean water a day – well below the minimum required consumption of 64 ounces of water a day. Defendants Pickell and Gould, through their

policies, procedures, customs and/or deliberate indifference to Plaintiffs' well-being, ensured that even after bottled water was delivered to Plaintiffs, at least half of the water Plaintiffs consumed was contaminated.

97.    Astonishingly, arbitrary water rationings were not the only way Plaintiffs were forced to drink contaminated water. Plaintiffs were not offered any sort of clean water until well over a year after Defendants Pickell and Gould knew that the Genesee County Jail's tap water was contaminated. Even after bottled water was available to the jail, Plaintiffs were routinely denied access to the water. Plaintiffs were denied clean water by Genesee County Jail personnel, whom Defendants Pickell and Gould were responsible for, subjectively believed that Plaintiffs did not "deserve it." Withholding clean water as punishment amounts to unconstitutional torture practices.

98.    On other occasions, employees and/or agents of the Genesee County Jail simply refused to distribute bottled water to Plaintiffs and kept the bottled water for their own use. Defendants Pickell and Gould knew that Plaintiffs were not given a consistent supply of bottled water, and that the water was never distributed in sufficient quantities. Defendants Pickell and Gould refused to take action because of their deliberate indifference to Plaintiffs' well-being and constitutional rights.

99.    To further spite Plaintiffs, the Genesee County Jail eventually allowed Plaintiffs to purchase bottled water from the Jail commissary. The Genesee County Jail, through Defendants Pickell and Gould, audaciously denied Plaintiffs clean water and, instead, offered to sell Plaintiffs non-contaminated water at a premium. For Plaintiffs

who could not afford the water, they were given no option but to continue drinking contaminated water.

100.   Defendants' actions evidence an egregious infringement upon the fundamental constitutional and human rights of Plaintiffs. Defendants knowingly forced Plaintiffs to drink contaminated water, denied them access to clean water, and ensured that Plaintiffs suffered severe and permanent injuries.

101.   Each Plaintiff herein has consumed lead-contaminated water, because of Defendants' actions and/or omissions. As a direct and proximate result of Defendants' actions and/or omissions, Plaintiffs have suffered injuries including, but not limited to, hair, skin, digestive, and organ problems; physical pain and suffering; disability; brain and developmental injuries including cognitive deficits; and aggravation of pre-existing conditions. A favorable decision from this Honorable Court would likely redress Plaintiffs' injuries.

**COUNT I**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**
**(EIGHTH AMENDMENT – CRUEL AND UNUSUAL PUNISHMENT)**

**(Against All Defendants)**

102.   Plaintiffs incorporate herein all the prior allegations.

103.   Pursuant to the Eighth Amendment to the United States Constitution, at all times relevant, Plaintiffs had the right to be free from cruel and unusual punishment while in the custody and control of Defendants Genesee County, Pickell and Gould.

104.   Notwithstanding duties to prevent the cruel and unusual punishment of Plaintiffs while under their custody and control, Defendants Genesee County, Pickell and Gould knowingly subjected Plaintiffs to conditions posing and/or exacerbating a substantial risk of serious harm to them.

105.   Defendants Genesee County, Pickell and Gould repeatedly and willfully failed to provide Plaintiffs with the public health conditions, namely clean water, that were necessary to avoid serious medical injuries. Defendants Genesee County, Pickell and Gould repeatedly and willfully failed to provide Plaintiffs with clean water although they were on notice that the Genesee County Jail had contaminated water and that it would cause Plaintiffs serious medical injuries. Defendants Genesee County, Pickell and Gould remained deliberately indifferent to Plaintiffs' wellbeing although they knew that in so doing, they were depriving Plaintiffs of basic needs and violating their constitutional rights.

106.   Throughout Plaintiffs' incarceration, the failure to provide safe drinking water and/or the delay in providing safe drinking water by each and every Defendant constituted cruel and unusual punishment in violation of Plaintiff's Fourth, Eighth, and Fourteenth Amendment rights.

107.   The acts and/or omissions by all Defendants were unreasonable and performed knowingly, deliberately, indifferently, intentionally, maliciously, and with gross negligence, callousness, and deliberate indifference to Plaintiffs' well-being.

108.   At all times relevant, the law and Plaintiffs' rights were clearly established, and Defendants' actions were not objectively reasonable, and they are not entitled to qualified immunity.

109.   Defendants Genesee County, Pickell and Gould adopted, promulgated, encouraged, condoned, and/or tolerated official customs, policies, practices, and/or procedures, including such for failing to train, discipline and/or supervise its employees/agents, which were the motivating force for the Defendants' conduct as described herein, such that same also amounted to a deliberate indifference to Plaintiffs' well-being.

110.   As a direct and proximate result of all of the above Defendants' conduct and/or failures to act, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits, lost earning capacity, aggravation of pre-existing conditions, contract damages and punitive damages.

## COUNT II
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
## (FOURTH AND FOURTEENTH AMENDMENTS – CONSPIRACY)

### (Against All Defendants)

111.   Plaintiffs incorporate herein all the prior allegations.

112.   Defendants Genesee County, Pickell and Gould conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among themselves for the purpose of depriving, either directly or indirectly, Plaintiffs of the equal protections of the laws and of their equal privileges and immunities under the law. As alleged above, Defendants have evidenced an animus against Plaintiffs.

113.   Defendants Genesee County, Pickell and Gould's actions were under the color of law and evidence a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

114.   As a direct and proximate result of all of the above Defendants' conspiracy, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits, lost earning capacity, aggravation of pre-existing conditions, contract damages and punitive damages.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request this Honorable Court enter a judgment in their favor against Defendants and award Plaintiffs: compensatory and punitive damages, and reasonable attorney fees, and prays that this Honorable Court:

(A)   Award compensatory damages in an amount determined by a jury;

(B)   Award punitive damages in an amount determined by a jury;

(C)   Award reasonable attorney fees and the costs and disbursements of this action; and

(D)   Grant such further relief as this Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. P. 38.

Respectfully submitted,

Dated: June 25, 2018          EXCOLO LAW, PLLC

                  By:   */s/ Solomon M. Radner*
                        SOLOMON M. RADNER (20195)
                        26700 Lahser Road, Suite 401
                        Southfield, Michigan 48033
                        866.939.2656

                        *Attorneys for Plaintiffs*

                        Marc J. Bern & Partners, LLP

                  By:   */s/ Conrad J. Benedetto*
                        Marc J. Bern, Esq.
                        Ryan Sharp, Esq
                        60 E 42nd St, Suite 950
                        New York, NY 10165
                        (800) 529-5432

                        *Attorneys for Plaintiffs*

37

Law Offices of Conrad J. Benedetto

By:   _/s/ Conrad J. Benedetto_____
      Conrad J. Benedetto, Esq.
      1615 S. Broad Street
      Philadelphia, PA 19148
       (215) 389-1900

      *Attorneys for Plaintiffs*