I                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
                            SOUTHERN DIVISION


HATCHER, et al.,                          Case No: 18-cv-11986

        Plaintiffs,                       Judge Judith E. Levy
                                          Magistrate Judge Elizabeth A. Stafford
v

GENESEE COUNTY, et al.,

        Defendants.

| | |
|---|---|
| SOLOMON M. RADNER P73653<br>Excolo Law, PLLC<br>Attorneys for Plaintiffs<br>26700 Lahser Rd., Ste. 401<br>Southfield, MI 48033<br>(866) 939-2656<br>sradner@excololaw.com | CONRAD J. BENEDETTO, ESQ.<br>Law Offices of Conrad J. Benedetto<br>Attorneys for Plaintiffs<br>1615 S. Broad Street<br>Philadelphia, PA 19148<br>(215) 389-1900<br>cjbenedetto@benedettolaw.com |
| MARC J. BERN, ESQ.<br>RYAN SHARP, ESQ.<br>Mark J. Bern & Partners, LLP<br>Attorneys for Plaintiffs<br>60 E. 42nd St., Ste. 950<br>New York, NY 10165<br>(800) 529-5432<br>rsharp@bernllp.com | MICHAEL W. EDMUNDS P55748<br>Atty for all Defendants<br>Gault Davison, PC<br>8455 S. Saginaw St., Ste. 2<br>Grand Blanc, Michigan 48439<br>(810) 234-3633<br>medmunds@edmundslawoffice.com |


**<u>DEFENDANTS GENESEE COUNTY, SHERIFF ROBERT PICKELL,
AND CAPTAIN JASON GOULD'S ANSWER,
AFFIRMATIVE DEFENSES, AND RELIANCE UPON JURY DEMAND</u>**

**INTRODUCTION**

1.      This cases arises from the poisoning of the Plaintiffs, inmates of the Genesee
County Jail, which lead from Flint's pipes and service lines, after Defendants
participated in switching the City of Flint's drinking water supply to the Flint River,
without the use of any corrosion control.

**ANSWER:**

**Defendants deny the allegation that they participated in switching the City of Flint drinking water for the reason it is untrue.  Defendants deny the allegation that the Plaintiffs were poisoned by lead in the drinking water because it is untrue.**

2.    In 2014, Defendants discovered that dangerous levels of lead were leaching into Flint's drinking water, Defendants failed to take any measures to eliminate this danger, as required by federal law, and took affirmative steps to downplay the severity of the contamination from its citizens.  In doing so, Defendants evidenced a deliberate indifference to Plaintiffs' devastating and irreversible health problems.

**ANSWER:**

**Defendants admit that they became aware, through the media, of allegations that there were high levels of lead in Flint's drinking water.  Defendants deny the allegation that they took no measures to eliminate this danger for the reason that they tested the water in the jail, which did not show lead contamination, and because they completely replaced all drinking water in the jail with bottled water until they were able to install a filter.  Answering affirmatively, none of the Plaintiffs have ever been exposed to any lead in any water they drank in the jail.**

3.    Plaintiffs seek recovery from Defendants from injuries, damages, and losses suffered by Plaintiffs as a result of their exposure to lead and other toxic substances

from Defendants' ownership, use, management, supervision, storage, maintenance, disposal, and/or release of highly corrosive water from the Flint River into the drinking water of the Genesee County Jail.

**ANSWER:**

**Defendants deny all liability to the Plaintiffs for the reasons stated in answer to no. 2.**

4.    The actions of the City of Flint, Genesee County, and the State of Michigan, along with their agencies, employees, and agents inflicted immeasurable harm on Plaintiffs amounting to a violation of Plaintiffs' constitutional rights.  Plaintiffs were specifically harmed by Defendants, who provided only lead-water to the inmates, despite knowing the water was lead-water.

**ANSWER:**

**Defendants neither admit nor deny the allegations directed at the City of Flint and the State of Michigan, for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.  Defendants deny the balance of the allegations contained in this paragraph for the reasons stated in answer to no. 2.**

5.    The injuries to Plaintiffs resulted from the policies and/or practices of the Genesee County.

**ANSWER:**

**Denied for the reason it is untrue.**

6.     The individually named Defendants, Sheriff Robert Pickell and Captain Jason Gould, acting for the county under color of law, deprived Plaintiffs of their constitutional rights.

**ANSWER:**

   **Denied for the reason it is untrue.**


7.     Defendant Genesee County provided the individually named Defendants with the authority that the individual Defendants must be deemed to act with the authority of the government.

**ANSWER:**

   **Defendants do not understand the allegations in this paragraph.  Answering affirmatively, Defendants admit that Sheriff Pickell and Captain Gould acted under color of state law and with authority they received from Defendant Genesee County.  Defendants deny all liability to the Plaintiffs for the reasons stated in response to paragraph no. 2.**


8.     The individually named Defendants' conduct was so dominated by governmental authority that the individual Defendants must be deemed to act with the authority of the government.

**ANSWER:**

   **Defendants do not understand the allegations in this paragraph.  Answering affirmatively, Defendants admit that Sheriff Pickell and Captain Gould acted under color of state law and with authority they received from Defendant**

**Genesee County.  Defendants deny all liability to the Plaintiffs for the reasons stated in response to paragraph no. 2.**

9.    Plaintiffs bring this action for damages against those Defendants named in their individual capacities who acted under color of law depriving Plaintiffs of their constitutional rights.

**ANSWER:**

**Defendants admit that they acted under color of state law.  Defendants deny the allegation that they deprived Plaintiffs of their constitutional rights for the reason it is untrue.**

10.    The health effects of lead poisoning are well known.  Lead impacts nearly every organ and system in the human body and causes a variety of serious injuries to the nervous system, which can lead to convulsions, coma and brain death.  Lead causes learning and behavioral disorders, memory less, nausea, anemia, hearing loss, fatigue, colic, hypertension, and myalgia.

**ANSWER:**

**Admitted, except the impact of lead varies depending on the amount of lead, and the age of the person who is exposed to it.**

11.    As a direct and proximate result of Defendants' deliberate indifference and conspiracy, Plaintiffs were directly exposed to hazardous and toxic substances known to cause disease, and this exposure caused or contributed to Plaintiffs'

injuries.  Therefore, the doctrine of joint and several liabilities should be extended
to apply to each Defendant herein, in their individually capacities.

**ANSWER:**

    **Denied for the reason it is untrue.**

12.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered
injuries and currently suffer and will continue to suffer damages and losses which
include, but are not limited to, physical and psychological injuries, learning and other
permanent disabilities, pain, mental anguish, emotional distress, the loss of
household services, the cost of medical, educational and rehabilitation expenses
and other expenses of training and assistance, and loss of earnings, income, and
earning capacity.  Such injuries, damages and loss are reasonably likely to continue
to occur in the future.

**ANSWER:**

    **Denied for the reason it is untrue.**

## PARTIES

13.    Plaintiffs Imani Hatcher, De'angelo Landsdown, Elvin Coleman, De'quan Hughes,
Derrick Reed Jr., Joseph Murphy, Aaron Ambs, Lajuane Grigsby, Jennara Wise,
Jeanette Chapman, Avanell Jackson, Nickolas Morrison, Michael Love, Thermon
Atkins, Jacrisha Johnson, Clarissa Walton, Janarick Harper, Deonte James, Erica
Wright, Mary Kelly, James Gorrell, Won Jewel Snell, Darin Smith, Jennie Hayward,
Diana Lynn Buffey, Christina Pantoja, Jordan Tarrence, Devin Smith, Rory Dixon,
Dustin Dady, Donta Breed Jr., Justin Obryan, Shanie Bailey, Stefan Felton, Utesha

Taylor, Genetha Taylor, Kelvin Cobb, Larry Brown, Stacy Longrie, Jeremy Tyree, Simon Greenlick, Leshawn Sanders, Gary Hill, Richard Lawrence, Clee Cooper, Michael Sweet, Chalita Crump, Dajuan Munerlyn, Laura Hayward, Maurice Rice, Bridgett Mancour, Brett Allen Anderson Ii, Alicia Mitchell, Jeffery Jones, Rebecca Gagnon, Erik Gaither, Erin Middleton, Samantha Rupp, Christina Stevens-ivory, D'mondre Wright, Cody Arwood, Tre-quan Marchall, Eric Morris-lester, Travis Lane, Michael Clack, Kentay Coles, Donald Scott, Senecca Harden, Keivon Powell, Sanika Williams, Christal Mccaa, Jordan Shealey, Randall Detamore, Arron Warson, Rayna Miller Mckay, Mercedes Barajas, Cortez Turner, Tarence Marshall, Samual Burch, James Brown, Carrie K. Venable, Derrick Walton, Jr.., Norah Howell Ann, Deidra Myers, Christopher Adams, Bradley Sharp, Feronda Smith, Steven Hebel, Douglas Long, Brian Brochu, A'shiaya Arkwright, and Maegan Dawson, were at all relevant times inmates of the Genesee County Jail in the City of Flint and connected to Flint's water system. Plaintiffs were exposed to extremely high levels of lead due to the deliberate actions of the Defendants, having bathed in and consumed lead contaminated water. All Plaintiffs reside in Genesee County and are domiciled within the jurisdiction of the Eastern District of Michigan.

**ANSWER:**

**Defendants neither admit nor deny the allegations that the Plaintiffs were inmates of the Genesee County Jail "at all relevant times," and the allegation that all Plaintiffs reside in Genesee County, for lack of knowledge or information sufficient to form a belief as to the truth of the allegation. Defendants admit the allegation that the Genesee County Jail is within the City**

**of Flint and connected to the Flint water system.  Defendants admit that the United States District Court has jurisdiction over these parties.  Defendants deny the allegation that Plaintiffs were exposed to high levels of lead in the Genesee County jail for the reasons stated in answer to paragraph no. 2.**

14.     As a result of Defendants' deliberate actions, Plaintiffs have suffered injuries including but not limited to: various health problems (including, without limitation: hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive defects, lost earning capacity, aggravation of pre-existing conditions, and contract damages.

**ANSWER:**

   **Denied for the reason it is untrue.**

15.     Defendant Genesee County is a Michigan Municipal corporation and is responsible for maintaining the Genesee County Jail.

**ANSWER:**

   **Admitted**.

16.     Defendant Sheriff Robert Pickell (hereafter "Pickell") was at all times relevant, the Sheriff of Genesee County and responsible for the operation of the Genesee County Jail.  At all times relevant Pickell acted within the course and scope of his

employment and/or authority under color of law.  He is sued herein in his individual and official capacities.  At all relevant times, Pickell knew that inmates of the Genesee County Jail, including Plaintiffs, were being exposed to lead contaminated water.  As sheriff, Pickell was ultimately responsible for the operations of the Genesee County Jail and is tasked with ensuring that inmates are not subjected to unconstitutionally inhumane conditions.  In a deliberately indifferent manner, Pickell participate in, approve of, and/or assented to the decision to allow Flint's water to be delivered to Plaintiffs without corrosion control or proper study and/or testing.  Further, Defendants Pickell failed to ensure that inmates were provided with clean water, bottled or otherwise, in a timely and consistent manner.  Defendant Pickell knew that the Genesee County Jail was providing inmates with contaminated water and prohibited Plaintiffs from using any clean water that was delivered to them.  Put another way, Defendant Pickell forced Plaintiffs to drink contaminated water and refused to give them access to clean water.  Defendant Pickell violated clearly established constitutional rights of Plaintiffs, including but not limited the rights to bodily integrity and to be free from state created danger.  Defendant Pickell's actions evidence deliberate indifference to whether an injury resulted to Plaintiffs.

**ANSWER:**

**Defendants admit the allegation that Sheriff Pickell was responsible for the operation of the Genesee County Jail, and acted within the course and scope of his employment and under color of state law.  Defendants deny the balance of the allegations contained in this paragraph because they are untrue, for the reasons stated in answer to paragraph no. 2.**

17.     Defendant Captain Jason Gould (hereafter "Gould") was at all times relevant Jail Administrator of the Genesee County Jail and acted within the course and scope of his employment and/or authority under color of law.  He is sued herein in his individual and official capacities.  At all relevant times, Gould knew that inmates of the Genesee County Jail, including Plaintiffs, were being exposed to lead contaminated water.  In a deliberately indifferent manner, Gould participated in, approved of, and/or assented to the decision to allow Flint's contaminated water to be delivered to Plaintiffs without corrosion control or proper study and/or testing.  Further, Defendant Gould failed to ensure that inmates were provided with clean water, bottled or otherwise, in a timely and consistent manner.  Defendant Gould knew that the Genesee County Jail was providing inmates with contaminated water and prohibited Plaintiffs from using any clean water that was delivered to them.  Put another way, Defendant Gould forced Plaintiffs to drink contaminated water and refused to give them access to clean water.  Defendant Gould violated clearly established constitutional rights of Plaintiffs, including but not limited the rights to bodily integrity and to be free from state created danger.  Defendant Gould's actions evidence deliberate indifference to whether an injury resulted to Plaintiffs.

**ANSWER:**

**Defendants admit the allegation that Captain Gould was responsible for the operation of the Genesee County Jail, and acted within the course and scope of his employment and under color of state law.  Defendants deny the balance of the allegations contained in this paragraph because they are untrue, for the reasons stated in answer to paragraph no. 2.**

18. Through its Department of Public Works, Flint distributes water to the Genesee County Jail and its inmates, and the Defendants knew that.

**ANSWER:**

   **Admitted**.

19. When Flint Emergency Manager Darnell Earley, as the City's ultimate policymaking authority, made the decision, on behalf of the State of Michigan and the City, to rush the distribution of water from the Flint River without proper treatment, including corrosion control, Plaintiffs were poisoned.

**ANSWER:**

   **Defendants neither admit nor deny the allegation that Earley rushed the distribution of water without proper treatment, for lack of knowledge or information sufficient to form a belief as to the truth of the allegations. Defendants deny the allegation that Plaintiffs were poisoned for the reasons stated in answer to paragraph no. 2.**

20. It was the official custom, policy, and/or practice of Defendant Genesee County that led to the violations of Plaintiffs' constitutional rights described herein.

**ANSWER:**

   **Defendants deny the allegation that Plaintiff's constitutional rights were violated for the reasons stated in answer to paragraph no. 2. Defendants admit that they acted pursuant to Genesee County custom and policy in testing the water and providing bottled water to Plaintiffs, and ultimately in**

**installing a water filter.**

21.     The actions of lower level County employees, not named as Defendants herein, in delivering Plaintiffs unsafe water were constrained by policies not of their own making.  Flint's water treatment employees were inadequately trained.  Considering the duties assigned to them the need for more training was obvious, and the inadequacy was so likely to result in violation of constitutional rights that Flint's policy makers can reasonably said to have been deliberately indifferent to the need for additional training.  The County is liable because, through its policy makers, it violated the constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger.

**ANSWER:**

   **Defendants neither admit nor deny the allegations directed at Flint employees including policy makers, for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.  Defendants deny the allegation that they gave Plaintiffs unsafe water and the allegation that Defendants violated Plaintiffs' constitutional rights, for the reason it is untrue.**

22.     Further, Defendants Pickell and Gould were at all pertinent times supervisors to these lower level subordinates, and at least implicitly approved, acquiesced, or authorized the complained of conduct of their subordinates.

**ANSWER:**

   **Admitted, but Defendants deny the implicit allegation that the subordinates**

**acted unlawfully, for the reason it is untrue.**

## JURISDICTION AND VENUE

23.     This is a civil action for money damages brought pursuant to 42 U.S.C. § 1983, and

        the Eighth and Fourteenth Amendments to the United States Constitution.

**ANSWER:**

    **Admitted.   Answering affirmatively, Defendants deny all liability to the**

    **Plaintiffs.**

24.     This Court has original jurisdiction over Plaintiffs' claims presented in this Complaint

        based upon the laws of the United States pursuant to 28 U.S.C. § § 1331 and 1343.

**ANSWER:**

    **Admitted**.

25.     The unlawful actions allege in this Compliant took place within the jurisdiction of the

        United States Eastern District of Michigan.

**ANSWER:**

    **Defendants admit that all relevant actions took place in the Eastern District of**

    **Michigan.  Defendants deny the allegation that their actions were unlawful for**

    **the reason it is untrue.**

26.     All Defendants reside in this district within the meaning of 28 U.S.C. 1391(c). This

        Court has personal jurisdiction over all Defendants because a Michigan state court

would have personal jurisdiction under MCL 600.701 and MCL 600.705.

**ANSWER:**

    **Admitted.**


27.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391(b)(1) and (2).

**ANSWER:**

    **Admitted.**


## FACTUAL BACKGROUND

28.    This case arises from the tragic and preventable poisoning of the City of Flint and

its residents.  The outrageous acts and omissions of the Defendants have caused

immeasurable and irreparable harm to Plaintiffs.

**ANSWER:**

    **Defendants admit that it is tragic if any Flint citizens were poisoned. Defendants neither admit nor deny the allegation that the poisoning was preventable for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.  Defendants deny the allegation that they have harmed Plaintiffs because they are not the City of Flint, are not responsible for the decisions of the City of Flint, and because Defendants did nothing to expose Plaintiffs to lead in water.**


29.    The actions of the individually named Defendants, Pickell and Gould, acting under

color of law and failing to protect Plaintiffs, and then obscuring their mistakes as

Plaintiffs continued to suffer, evidenced a deliberate indifference to Plaintiffs' constitutional rights and denies Defendants the protections of qualified immunity.

**ANSWER:**

**Denied for the reason it is untrue.**

30.     As a direct and proximate result of Defendants' actions and/or failures to act, Plaintiffs' constitutional and other rights have been violated and Plaintiffs have suffered serious physical, mental, economic, and emotional injuries.

**ANSWER:**

**Denied for the reason it is untrue.**

31.     At all times between December 2011 and April 30, 2015, the City of Flint was under the control and authority of an Emergency Manager appointed by, and serving under the direction of Governor Synder.  Michael Brown served Governor Synder as Flint's Emergency Manager from December 2011 until August 2012.  Ed Kurtz served Governor Synder as Flint's Emergency Manager from August 2012 until July 2013.  Michael Brown again served Governor Synder as Flint's Emergency Manager from July 2013 until October 2013.  Non-Party Earley served as Governor Synder as Flint's Emergency Manager from October 2103 until January 2015.  Non-Party Ambrose served  Governor Synder as Flint's Emergency Manager from January 2015 until April 30, 2015.  Thus, at all relevant times prior to April 30, 2015, Flint's local government was under the control and direction of the State of Michigan.

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

32. The MDEQ, as a matter of pattern, practice, custom, and policy, has deliberately failed to adequately protect Plaintiffs from lead contaminated drinking water.  In 2010, the EPA commissioned a report that indicated problems with the MDEQ's ability to ensure safe drinking water.  The report noted that funding cuts caused important MDEQ staff positions to be filled "with staff from other programs that have been cut or eliminated...while this practice preserves jobs, it decreases the technical knowledge of staff[.]" The report stated that "training for new staff would also be appreciated on fundamental public health issues and compliance decisions."  The report also indicated several technical shortcomings with the way the MDEQ regulated the State's drinking water - particularly as it related to lead contamination.  The report noted that while federal regulations require water utilities to certify that the drinking water in 90% of homes in each community contain no more than 15 parts per billion ("ppb") of lead, MDEQ has a practice of not even calculating "90th percentiles" unless a potential exceedance had been identified.  This "does not meet the requirements of Federal Regulations, since it is required that all 90th percentiles be calculated."  The report also noted that MDEQ did not conduct the required number of water samples for lead, allegedly to conserve agency resources.  Organizational and individual actions and failures of the MDEQ, such as those illustrated in the report, directly resulted in the Flint catastrophe.

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or**

**information sufficient to form a belief as to the truth of the allegations.**

33.     The MDEQ failed to follow the EPA's Lead and Copper Rule ("LCR") in Flint. The

EPA is responsible for setting rules under the Safe Drinking Water Act. Enforcement

and implementation of those rules is delegated to state environmental agencies -

in Michigan, that agency is the MDEQ.   The EPA's LCR was enacted to establish

protocols to ensure that public water systems do not allow unsafe levels of lead or

copper to contaminate their drinking water supply.   While failing to protect Plaintiffs,

the MDEQ violated both the letter and spirit of the LCR.   Specifically, the MDEQ

violated the LCR in at least the following ways: failing to require corrosion control

for Flint River water from the moment Flint began drawing it; misinforming the EPA

about whether corrosion control was being utilized; improperly conducting sampling.

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or
information sufficient to form a belief as to the truth of the allegations.**

34.     Rather than taking any preventative measures, the MDEQ determined it was

sufficient to conduct two rounds of six-month lead sampling, using Flint's residents,

including Plaintiffs, as human test subjects in a process of trial and error.   The first

round of lead sampling was conducted between July and December 2014, and the

second between January and June 2015.   Despite the sampling procedures being

woefully inadequate, even the flawed tests showed rising lead levels in Flint's water.

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

35.     In conducting the sampling required under the LCR, the MDEQ collected an insufficient number of samples, consistent with the MDEQ's pattern, practice, policy, and custom of deliberate indifference to Plaintiffs' well-being.  The LCR requires at least 50% of home sampled to be verified as having lead pipes, with the remaining 50% to have been built before 1986 and known to have lead solder.  Flint's data was essentially useless because MDEQ failed to require that the appropriate number of samples be drawn from these "high risk" homes.  Because an insufficient number of samples were taken from a pool of homes that were not properly determined to be "high risk," the City of Flint has not had a valid LCR sampling event since the switch to the Flint River.

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

36.     The MDEQ, through its former director, has admitted that it did not follow the LCR, and that it should have required corrosion control.  Had the MDEQ followed the LCR, it would have required water quality parameters and optimized corrosion control on the Flint River water from the very beginning, which likely would have prevented the public health catastrophe that caused Plaintiffs to suffer injuries and damages.  Instead, the MDEQ engaged in a pattern of deliberate indifference and aggressive denial since the City of Flint started drawing water from the Flint River.

At all relevant times, MDEQ and its employees insisted, despite overwhelming evidence to the contrary, that Flint complied with water safety regulations.

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

37.   Under the State's authority, Flint's water supply was switched to the Flint River without the provision of any corrosion control, causing poisonous lead from thousands of pipes to leach into Plaintiffs' drinking water.  For decades prior to April 25, 2014, the City of Flint received safe, clean, treated drinking water from the Detroit Water and Sewer Department ("DWSD").  In November of 2012, Emergency Manager Ed Kurtz wrote to Treasurer Andy Dillion suggesting that Flint join the yet-to-be formed Karegnondi Water Authority (KWA) due to potential cost savings over DWSD.  In April 2013, Dillion gave Kurtz permission to notify the DWSD that it would be terminating service and switching to the KWA in the coming years.  On April 16, 2013, Kurtz ordered that Flint would switch its long-term water supplier from the DWSD to the KWA.  The KWA depended on an infrastructure that had not yet been built.  While waiting for the KWA to come online, the Emergency Manager ordered that instead of temporarily remaining with DWSD, Flint would switch to the Flint River as a temporary source for the City's water.

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

38.     The temporary use of the Flint River was also designed as a cost-cutting measure. The Flint River was studied for use as a primary water source in a 2011 feasability report, of which Defendants were aware.  At that time, the Flint River was rejected because the costs to prepare Flint's water treatment plant to treat Flint River water to applicable standards were estimated to be in the tens of millions of dollars.

**ANSWER:**

**Defendants deny the allegation that they were aware of a 2011 feasibility report, for the reason it is untrue.  Defendants neither admit nor deny the balance of the allegations in this paragraph for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

39.     According to the EPA, "it is critical that public water systems, in conjunction with their primary agencies and, if necessary, outside technical consultants, evaluate and address potential impacts resulting from treatment and/or source water changes."  Various factors specific to individual water sources necessitate different treatments, including but not limited to the use of chemical additives.  Neither the State of Michigan, on its own or through its control over the City of Flint, the MDEQ, or LAN required water quality standards to be set for the Flint River water that would be delivered to Flint's residents, including Plaintiffs.  Further, none of the entities required corrosion control to be implemented to ensure that corrosive water was not delivered throughout Flint's aging water system.

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or**

**information sufficient to form a belief as to the truth of the allegations.**

40.     The water obtained from the Flint River was substantially more corrosive than the treated water Flint had been receiving from DWSD.  Water becomes more corrosive when it contains greater quantities of chloride, which can enter the water from manmade and natural sources.  Flint River water is known to contain approximately eight (8) times more chloride than the treated water that Flint had been receiving from DWSD.  It is well known that corrosive water that its not properly treatment results in the corrosion of pipes, such that the metals in the pipes, including lead, will leach into drinking water.

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

41.     Because of the failure to properly treat water from the Flint River, corrosive water was delivered throughout the Flint Water System.  The corrosive water predictably corroded metal pipes, causing them to leach into water.  The corrosive nature of the water was almost immediately apparent.  Soon after the switch, Flint residents began complaining about discolored water - clearly indicating that iron, lead, or other metals were leaching into the water.

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

42.     It is important that a new source of water be properly studied and treated to ensure that its use will not result in the corrosion of pipes in the delivery system.  Setting standards and optimal ranges for water quality is necessary to prevent widespread impacts from substandard or dangerous water.  This is particularly important where portions of the delivery system, including but not limited to service lines, are made of lead.   An estimated 15,000 of Flint's 30,000 residential service lines are composed at least partially of lead.   Upon information and belief, the Genesee County Jail had its water supplied by service lines containing lead.

**ANSWER:**

**Defendants deny the allegation that the service lines which supply water to the Genesee County Jail contain lead for the reason it is untrue.  Defendants neither admit nor deny the balance of the allegations contained in paragraph 42 for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

43.     Lead exposure causes problems including decreased IQ, behavioral problems, hearing impairment, impaired balance and nerve function, infections, skin problems, digestive problems, psychological disorders, digestive, cardiovascular, and reproductive problems, kidney damage, dizziness, fatigue, weakness, depression and mood disorders, diminished cognitive performance, nervousness, irritability, and lethargy.  There is no safe level of lead as its effects are harmful even at low levels.

**ANSWER:**

**Admitted, except that it depends upon the amount of lead and the age of the**

**person exposed to the lead.**

44.     Lead contamination is not the only problem that is caused when corrosive water is distributed in a public water system.  When water corrodes iron pipes, the iron leaching into the water system can consume chlorine.  This can eliminated the chlorine necessary to prevent the growth of microorganisms that can cause disease.  With chlorine is consumed by iron, the risk of infection by organisms such as legionella increases.  Corrosion of iron water pipes is obvious when it occurs, as the water appears discolored.  The corrosion of iron pipes can also result in an increase in water main leaks and breaks.  The signs of iron corrosion are a warning sign that lead corrosion may also be present, since both are caused by the same phenomenon.

**ANSWER:**

   **Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

45.     Almost immediately after the water source was changed to the Flint River, signs of trouble with Flint's water quality began to surface.  Within weeks, many residents began to complain about odorous, discolored water.  As complaints rolled in, Flint Mayor Walling called the water a "safe, quality product," and claimed that "people are wasting their precious money buying bottled water."  In August and September 2014, the City of Flint issued two boil water advisories after fecal coliform bacteria was discovered in the water.

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

46.   On October 13, 2014, General Motors ceased the use of Flint River water at its engine plant because of fears that it would cause corrosion due to high levels of chloride.  Discussing General Motors' decision, Prysby wrote to Busch, Skekter-Smith and others that the Flint River water had elevated chloride levels.  He stated that "although not optimal" the water was "satisfactory."  He noted that he had "stressed the importance of not branding Flint's water as 'corrosive' from a public health standpoint simply because it does not meet a manufacturing facility's limit for production."

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

47.   On January 2, 2015, the City of Flint mailed a notice to its water consumers indicating that it was in violation of the Safe Drinking Water Act due to the presence of trihalomethanes, which was a product of attempting to disinfect the water.  It was claimed that the water was safe to drink for most people with healthy immune systems.

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

48.     With the Flint water quality problems now being recognized, on January 12, 2015,
        DWSD offered to waive a four (4) million-dollar reconnection fee to transition back
        to DWSD water.  Ambrose, as Emergency Manager, declined the offer.

**ANSWER:**

   **Defendants neither admit nor deny the allegations for lack of knowledge or
   information sufficient to form a belief as to the truth of the allegations.**

49.     On January 21, 2015, enraged Flint residents attended a meeting at Flint City Hall,
        bringing jugs of discolored water and complaining about the water's smell and taste.

**ANSWER:**

   **Defendants neither admit nor deny the allegations for lack of knowledge or
   information sufficient to form a belief as to the truth of the allegations.**

50.     As early as January of 2015, the State of Michigan provided purified water coolers
        at its Flint offices in response to concerns about the drinking water, while State
        employees continued to tell the public that the water was safe to drink.

**ANSWER:**

   **Defendants neither admit nor deny the allegations for lack of knowledge or
   information sufficient to form a belief as to the truth of the allegations.**

51.     In a January 29, 2015 e-mail to MDEQ, Deputy Director Jim Sygo, Shekter-Smith
        made statements indicating her personal knowledge of the Flint River's corrosivity.
        "I'm theorizing here, but most likely what they are seeing is a result of differing water

chemistry.  A change in water chemistry can sometimes cause more corrosive water to slough material off of pipes as opposed to depositing material or coating pipes in the distribution system.  This may continue for a while until things stabilize.  It would be unusual for water leaving the plant to have color like people are seeing at their taps.  Generally this is a distribution system problem or a premise plumbing issue.  Since it appears wide-spread, it's most likely a distribution system problem."

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

52.  On February 6, 2015, an Emergency Manager staff member wrote to Prysby, described as the MDEQ's "most knowledgeable staff members on the Flint and Genesee County water supply issues," asking whether he knew if MDEQ had ever conducted a "source water assessment" for the Flint River.  After an initial response stating that he did not know, Prysby later responded that a study on the Flint River as an emergency intake had been conducted in 2004.  The 2004 study noted that the Flint River was a highly sensitive drinking water source that was susceptible to contamination, yet apparently even Prysby did not consult it before approving the Flint River as a source.

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

53.   On February 27, 2015, in response to concerns about extremely high levels of lead in a resident's water sample, Busch told the EPA on behalf of MDEQ that the Flint Water Treatment Plant had an optimized corrosion control program, despite the fact that it did not.   MDEQ was required to know whether Flint had an optimized corrosion control program, because ensuring the existence of that program was the express responsibility of MDEQ.   MDEQ did, in fact, know that no optimized corrosion control had been implemented, since MDEQ was involved in the decision not to implement corrosion control.   MDEQ did not require the use of corrosion control, and it did not set water quality parameters for the Flint River source water, both of which it was required to do., MDEQ's failures resulted in Plaintiffs' exposure to poisonous water that caused a variety of adverse health effects.

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

54.   On February 27, 2015, the EPA's regional drinking water regulations manager, Miguel Del Toral, began to voice his concerns about the likely cause of the high lead levels detected in Flint.   In an email to Prysby that date, which was also copied to Busch, Del Toral attributed those levels to particulate lead, which would mean that the MDEQ's testing methods of "pre-flushing" water from homes was generating inaccurate results.   He also inquired about optimized corrosion control, which he noted Flint was "required to have" in place.

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or**

**information sufficient to form a belief as to the truth of the allegations.**

55.     At another point in February 2015, Governor Synder received a briefing in Flint's water problems from MDEQ Director Dan Wyant, which included resident complaints about discolored, low quality tap water, and a letter from a state representative indicating that his constituents were "on the verge of civil unrest." Snyder took no significant action in response to the Flint residents' pleas - demonstrating his deliberate indifference to the health of Flint residents, including Plaintiffs.

**ANSWER:**

     **Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

56.     Around the same time, an MDEQ email explained away "hiccups" in the transition to Flint's water system, dismissing the possibility of imminent threats to public health, and noting that the switch to the Flint River "put the cit in the business of water production, where they had historically been in the business of water transmission."  It was claimed that "once the city connects to the new KWA system in 2016, this issue will face into the rearview." the MDEQ email also noted that "MDEQ approved the use of river as a source[.]"

**ANSWER:**

     **Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

57.    In early 2015, nonparty Veolia was hired to conduct a review of the City's water quality, largely in response to citizen complaints.  Veolia thereafter conspired with others to declare the water safe - with deliberate indifference to whether the water actually was safe.

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

58.    Veolia's task was to review Flint's public water system, including treatment processes, maintenance procedures, and actions taken.   As water treatment professionals, Veolia had an opportunity to correct what LAN had missed or refused to warn about - that corrosive water was being pumped through lead pipes into the homes of Flint residents without any corrosion control.

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

59.    Veolia issued an interim report on its findings, which is presented to a committed of Flint's City Council on February 18, 2015.  In its interim report, Veolia indicated that Flint's water was "in compliance with drinking water standards."  It also noted that "safe [equals] compliance with state and federal standards and required testing." Put another way, Veolia publicly declared Flint's corrosive water, which was leaching heavy metals from services lines, safe.  Veolia's interim report also noted

that the discoloration in Flint's water "raises questions," but "doesn't mean the water is unsafe."  The interim report noted that among Veolia's "next steps" were to "carry out more detailed study of initial findings" and "make recommendations for improving water quality."   In response to potential questions about "medical problems," Veolia's interim report dismissively claimed that "some people may be sensitive to any water."

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

60.   Veolia issued its final "Water Quality Report" dated March 12, 2015.  In the final report, Veolia noted that it had conducted a "160-hour assessment of the water treatment plant, distribution system, customer services and communication programs, and capital plans and annual budget."  The final report claims that a "review of water quality records for the time period under our study indicates compliance with State and Federal water quality regulations."  The final report states that "the public has also expressed its frustration of discolored and hard water. Those aesthetic issues have understandably increased the level of concern about the safety of the water.  The review of the water quality records during the time of Veolia's study shows the water to be in compliance with State and Federal regulations, and based on those standards, the water is considered to meet drinking water requirements."  Specifically addressing the lack of corrosion control, the final report notes that "many people are frustrated and naturally concerned by the discoloration of the water with what primarily to be iron form the old unlined cast iron

pipes.   The water system could add a polyphosphate to the water as a way to minimize the amount of discolored water.   Polyphosphate addition will not make discolored water issues go away.   The system has been experiencing a tremendous number of water line breaks the last two winters. Just last week there were more than 14 in one day.   Any break, work on broken valves or hydrant flushing will change the flow of water and potentially cause temporary discoloration."

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

61.   As a result, in addition to deliberately disregarding and/or concealing the connection between the lack of corrosion control and lead contamination, Veolia made a permissive "could" suggestion aimed only at reducing aesthetic deficiencies while suggesting that Flint's drinking water met all applicable requirements and was safe to drink.

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

62.   As a result of Veolia's actions, Plaintiffs continued to be exposed to poisonous water beyond February and March of 2015.

**ANSWER:**

**Denied for the reason it is untrue.**

63.     As evidence of problems mounted, the State and the MDEQ repeatedly denied the dangers facing Flint's residents, insisting that their water was safe to drink.

**ANSWER:**

   **Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

64.     On March 23-24, 2015, Flint's City Council voted 701 to end Flint River service and to return to DWSD.  Ambrose declared that vote "incomprehensible" and rejected the proposal.  Ambrose then publicly declared that "Flint water today is safe by all Environmental Protection Agency and Michigan Department of Environmental Quality standards, and the city is working daily to improve its quality...water from Detroit is no safer than water from Flint."

**ANSWER:**

   **Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

65.     On April 24, 2015, the MDEQ finally admitted to the EPA that Flint did not have optimized corrosion control in place, expressly contradicting its statements from two months prior.

**ANSWER:**

   **Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

66.   By no later than April 2015, but likely much earlier, Defendants Genesee County, Pickell, and Gould were undeniably aware that no corrosion control was being used in Flint following the switch to the Flint River as the water source.

**ANSWER:**

   **Defendants admit that they were generally aware from the news that there was a question about whether Flint's water was safe to drink due to possible lead exposure.   Defendants do not know when they became aware of these allegations.   Defendants deny the allegation that they were aware that no corrosion control was being used after the switch to Flint River water for the reason that they had no involvement in treating Flint's water.**

67.   On July 9, 2015, ALCU-Michigan reporter Curt Guyette publicly broke the story about lead in Flint's drinking water, citing Del Toral's Memorandum and exposing the lack of corrosion control in Flint's drinking water.

**ANSWER:**

   **Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

68.   In an email response to a Governor's office inquiry regarding the high lead levels in residents' homes and the discrepancy between those numbers and the State's test results, Defendant Wurfel stated "don't know what it is, but it know what it's not. The key to lead and copper in drinking water is that it's not the source water, or even the transmission lines (most of which are cast iron). It's in the premise

plumbing (people's homes)." This statement was made despite the facts that about half of Flint's homes are connected to lead service lines, and that it was clear by this point that Ms. Walter's home had plastic plumbing. Wurfel then blamed Del Toral, the ACLU, and others taking action to help Flint's residents, stating:"this person is the one who had EPA lead specialist come to her home and do tests, then released an unvetted draft of his report (that EPA apologized to us profusely for) to the resident, who shared it with ACLU, who promptly used it to continue raising hell with the locals...it's been rough sledding with a steady parade of community groups keeping everyone hopped-up and misinformed."

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

69.   Dr. Ewards published a report in early September 2015, with startling findings. Among them: "FLINT HAS A VERY SERIOUS LEAD IN WATER PROBLEM;" "101 out of 252 water samples from Flint homes had first draw lead more than 5 ppb;" "Flint's 90th percentile lead value is 25 parts per billion...over the EPA allowed level of 15 ppb that is applied to high risk homes...how is it possible that Flint 'passed' the official EPA Lead and Copper Rule sampling overseen by MDEQ?"; "Several samples exceeded 100 ppb and one sample collected after 45 seconds of flushing exceeded 1,000 ppb."

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or**

information sufficient to form a belief as to the truth of the allegations.

70.     Additional Edwards findings included that "on average, Detroit water is 19 times less corrosive than the Flint River water currently in use;" "even with phosphate, Flint River has 16 times more lead compared to the same condition using Detroit water."

**ANSWER:**

   **Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

71.     Therefore, the Flint River water was so corrosive that even the obvious, necessary measure of adding corrosion control may not have been enough to make it totally safe.

**ANSWER:**

   **Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

72.     This would have been known if the water were properly treated or studied before the switch.  Instead, by and through the actions of Defendants, Genesee County, Pickell and Gould herein, the residents of Flint, including Plaintiffs, were used as test subjects in a "test then treat" scenario that ensured at least one year of absolutely no protection from lead contamination.

**ANSWER:**

   **Denied.  These Defendants had nothing to do with the decision to change the**

**City of Flint's water supplier, and as soon as they became aware of the possibility that water in the Genesee County Jail might be contaminated with lead, they tested all water sources and provided bottled water.**

73.    A Centers for Disease Control and Prevention ("CDC") employee wrote to Genesee County Health Officials in April of 2015: "we are very concerned about this Legionnaires' disease outbreak...it's very large, one of the largest we know of in the past decade, and community-wide, and in our opinion and experience it needs a comprehensive investigation."  That email added "I know you've run into issues getting information you've requested from the city water authority and the MI Dept. of Environmental Quality.  Again, not knowing the full extent of your investigation it's difficult to make recommendations, and it may be difficult for us to provide the kind of detailed input needed for such an extensive outbreak from afar."

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

74.    On December 5, 2015, an employee of Genesee County Health Department accused State officials of covering up their mishandling of Flint's Legionnaires' disease outbreak.  Tamara Brickey wrote to colleagues that "the state is making clear they are not practicing ethical public health practice."  Further, "evidence is clearly pointing to a deliberate cover-up," and "in my opinion, if we don't act soon, we are going to become guilty by association."

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

75. Finally, after months of denial, deliberate obstruction, and lies, the State began to act on October 12, 2015. Governor Snyder received a proposal to reconnect Flint to DWSD and worked on plans for lead testing and water filters. Still, Governor Snyder's "comprehensive action plan" stated that "the water leaving Flint's drinking water system is safe to drink, but some families with lead plumbing in their homes or service connections could experience higher levels of lead in the water that comes out of their faucets."

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

76. Subsequent tests have shown that lead levels in Flint's water have been so high that filters could not remove all lead, meaning that the state's recommendation and distribution of filters as a solution continued to inflict harm.

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

77. On October 16, 2015, Flint reconnected to DWSD. However, the damage had been

done and lead has continued to leach from pipes into the water.

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

78.     On December 5, 2015, the City of Flint declared a state of emergency.  In response to a blog post by Professor Edwards entitled "Michigan Health Department Hid Evidence of Health Harm Due to Lead Contaminated Water.  Allowed False Public Assurances by MDEQ and Stonewalled Outside Researchers," the Governor's Communications Director wrote to Governor Snyder and others "it wasn't until the Hurley report came out that our epidemiologists took a more in-depth look at the data by zip code, controlling for seasonal variation, and confirmed an increased outside of normal trends.  As a result of this process we have determined that the way we analyze data collected needs to be thoroughly reviewed."

**ANSWER:**

**Defendants admit that the City of Flint declared a state of emergency on December 5, 2015.  Defendants neither admit nor deny the balance of the allegations contained in this paragraph for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

79.     On January 4, 2016, Defendant Genesee County declared a state of emergency.

**ANSWER:**

**Admitted**.

80.     On January 21, 2016, the EPA issued an Emergency Order, based on its finding

        that "the City of Flint's and the State of Michigan's responses to the drinking water

        crisis in Flint have been inadequate to protect public health and that these failures

        continue."

**ANSWER:**

        **Defendants neither admit nor deny the allegations for lack of knowledge or**

        **information sufficient to form a belief as to the truth of the allegations.**

81.     The Emergency Order included as Respondents the City of Flint, the MDEQ, and

        the Emergency Order provided for the EPA to conduct its own sampling of lead in

        Flint's water and undertake other actions as part of a process "to abate the public

        health emergency in the City of Flint."

**ANSWER:**

        **Defendants neither admit nor deny the allegations for lack of knowledge or**

        **information sufficient to form a belief as to the truth of the allegations.**

82.     The Emergency Order notes that "the presence of lead in the City water supply is

        principally due to the lack of corrosion control treatment after the City's switch to the

        Flint River as a source in April 2014.  The river's water was corrosive and removed

        protective coatings in the system.  This allowed lead to leach into the drinking water,

        which can continue until the system's treatment is optimized."

**ANSWER:**

        **Defendants neither admit nor deny the allegations for lack of knowledge or**

**information sufficient to form a belief as to the truth of the allegations.**

83.   The Emergency Order indicates that "water provided by the City to residents pose an imminent and substantial endangerment to the health of those persons.  Those persons' health is substantially endangered by their ingestion of lead in waters that persons legitimately assume are safe for human consumption."

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

84.   Further, the EPA states that "The City, MDEQ and State have failed to take adequate measures to protect public health."   The County equally failed with regards to the plaintiffs in this action.

**ANSWER:**

**Defendants deny the allegation that the County failed to take adequate measures to protect the Plaintiffs, for the reasons stated in answer to paragraph no. 2.  Defendants neither admit nor deny the balance of the allegations contained in this paragraph for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.**

85.   According to the Emergency Order: "Based upon the information and evidence, EPA determines that Respondents' actions that resulted in the introduction of contaminants, which entered a public water system and have been consumed and

may continued to be consumed by those served by the public water system, present

an imminent and substantial endangerment to the health of persons."

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or
information sufficient to form a belief as to the truth of the allegations.**

86.     In a public statement, EPA Administrator Gina McCarthy declared: "Let's be really

clear about why we are here today...we are here today because a state-appointed

emergency manager made the decision that the City of Flint would stop purchasing

treated water that had well served them for 50 years and instead purchase

untreated - and not treat that water - and by law the state of Michigan approved that

switch and did not require corrosion control.  All to save money.  Now that state

decision resulted in lead leaching out of lead service pipes and plumbing, exposing

kids to excess amounts of lead.  That's why we're here."

**ANSWER:**

**Defendants neither admit nor deny the allegations for lack of knowledge or
information sufficient to form a belief as to the truth of the allegations.**

87.     As the aforementioned facts subjected every resident of Flint to unconstitutionally

inhumane conditions, Plaintiff were subjected to an additional, unique, constitutional

violation.

**ANSWER:**

**Denied for the reason that not every resident of the City of Flint was receiving**

**water through lead service lines.  Answering affirmatively, the water service lines to the Genesee County Jail are not made of lead.  Therefore, Plaintiffs were never exposed to lead in the Genesee County Jail.**

88.     At all times relevant, Plaintiffs were inmates of the Genesee County Jail. Meaning that Plaintiffs could not travel to an area and/or municipality which had uncontaminated water.  Further, Plaintiffs had no discretion to install water filters on the water taps in their jail cells or to drink bottled water.  Put another way, Plaintiffs lacked their freedom and were completely at the mercy of Defendants Genesee County, Pickell and Gould, and the Genesee County Jail.

**ANSWER:**

**Defendants neither admit nor deny the allegation that all of the Plaintiffs were inmates of the Genesee County Jail for lack of knowledge or information sufficient to form a belief as to the truth of the allegations.  Assuming *arguendo* that the allegation is true, Defendants admit that Plaintiffs were not free to leave the jail and relied upon Defendants for water.**

89.     Because Plaintiffs, at all times relevant, were incarcerated and could not access clean water in any way, Defendants Genesee County, Pickell and Gould subjected Plaintiffs to a special danger as distinguished from the public at large.

**ANSWER:**

**Denied for the reason that Defendants provided bottled water to the Plaintiffs.**

90.    With full knowledge that the water in the Genesee County Jail was contaminated, Defendants Pickell and Gould forced Plaintiffs to continue drinking the contaminated water.

**ANSWER:**

   **Denied for the reasons stated in answer to paragraph no. 2.**

91.    Many of the individually named Plaintiffs attempted to have bottled water delivered to them by un-incarcerated loved ones.  However, Defendants Pickell and Gould, along with the employees and/or agents of the Genesee County Jail, prohibited Plaintiffs from accepting the deliveries.  Simply put, the Genesee County Jail, through Defendants Pickell and Gould, forced Plaintiffs to ingest contaminants which caused them severe and permanent injuries.

**ANSWER:**

   **Defendants admit that they did not allow the public to deliver open water to inmates.  Defendants deny the allegation that they did not allow the public to deliver any bottled water to inmates for the reason it is untrue.  Defendants deny the allegation that Defendants forced Plaintiffs to ingest contaminants, for the reasons stated in answer to paragraph no. 2.**

92.    Defendants Genesee County, Pickell and Gould's deliberate indifference to Plaintiffs' health was further exemplified when pregnant inmates at the Genesee County Jail were forced to drink contaminated water.

**ANSWER:**

**Denied for the reason it is untrue.**

93.    Further, employees and/or agents of the Genesee County Jail, whom Defendants Pickell and Gould were responsible for, lied to Plaintiffs and told them that the Genesee County Jail had switched back to DWSD water - over a year before that statement was true.  Defendants Pickell and Gould knowingly permitted their employees and/or agents to lie to Genesee County Jail inmates to convince them to drink contaminated water.

**ANSWER:**

**Defendants neither admit nor deny the allegations that Plaintiffs were wrongly told that the jail had switched back to DWSD for lack of knowledge or information sufficient to form a belief as to the truth of the allegations. Defendants deny the allegation that they told employees to lie to the Plaintiffs about the source of the jail water for the reason it is untrue.  Defendants also deny the allegation that inmates were drinking contaminated water because it is untrue.**

94.    Eventually, well over a year after Defendants Pickell and Gould were aware that Plaintiffs were being forced to drink contaminated water, the State of Michigan and/or Defendant Genesee County delivered bottled water to the Genesee County Jail.  Unfortunately, however, Defendants Pickell and Gould failed to ensure that the bottled water was given to Plaintiffs in a timely or consistent manner.

**ANSWER:**

**Defendants admit that they provided bottled water to the inmates. Defendants deny the balance of the allegations contained in this paragraph for the reason they are untrue.**

95. Employees and/or agents of the Genesee County Jail would knowingly withhold bottled water from Plaintiffs and force Plaintiffs to continue drinking the contaminated water. Defendants Pickell and Gould were deliberately indifferent to the actions of their employees and/or agents and knowingly allowed Plaintiffs to be deprived of their fundamental human rights.

**ANSWER:**

**Denied for the reason it is untrue.**

96. Instead of ensuring that Plaintiffs were given clean water in a timely and consistent manner, Defendants Pickell and Gould arbitrarily and inhumanely rationed Plaintiffs to only two (2) half liter bottles of water a day. Put another way, Plaintiffs were limited to 33.8 ounces of clean water a day - well below the minimum required consumption of 64 ounces of water a day. Defendants Pickell and Gould, through their policies, procedures, customs, and/or deliberate indifference to Plaintiffs' well-being, ensured that even after bottled water was delivered to Plaintiffs, at least half of the water Plaintiffs consumed was contaminated.

**ANSWER:**

**Defendants deny the allegation that they limited the amount of bottled water available to inmates for the reason it is untrue. Defendants admit that they**

**limited the number of *bottles* that were given to inmates per day.  Answering affirmatively, inmates were allowed to bring their empty bottles to Defendants to be refilled as many times as they wanted. Plaintiffs never consumed any contaminated water in the Genesee County Jail.**

97.     Astonishingly, arbitrary water rationings were not the only way Plaintiffs were forced to drink contaminated water.  Plaintiff were not offered any sort of clean water well over a year after Defendants Pickell and Gould knew that the Genesee County Jail's tap water was contaminated.  Even after bottled water was available to the jail, Plaintiffs were routinely denied access to the water.  Plaintiffs were denied clean water by Genesee County Jail personnel, whom Defendants Pickell and Gould were responsible for, subjectively believed that Plaintiffs did not "deserve it."  Withholding clean water as punishment amounts to unconstitutional torture practices.

**ANSWER:**

**Denied.   Answering affirmatively, the bottled water that the Defendants provided to the inmates was an extra precaution, above and beyond what was necessary, because the water in the jail was not contaminated with lead.**

98.     On other occasions, employees and/or agents of the Genesee County Jail simply refused to distribute bottled water to Plaintiffs and kept the bottled water for their own use.  Defendants Pickell and Gould knew that Plaintiffs were not given a consistent supply of bottled water, and that the water was never distributed in sufficient quantities.  Defendants Pickell and Gould refused to take action because

of their deliberate indifference to Plaintiffs' well-being and constitutional rights.

**ANSWER:**

**Denied for the reason it is untrue.**

99.   To further spite Plaintiffs, the Genesee County Jail eventually allowed Plaintiffs to purchase bottled water from the Jail commissary.  The Genesee County Jail, through Defendants Pickell and Gould, audaciously denied Plaintiffs clean water and, instead, offered to sell Plaintiffs non-contaminated water at a premium.  For Plaintiffs who could not afford the water, they were given no option but to continue drinking contaminated water.

**ANSWER:**

**Defendants admit the allegation that they allowed inmates to purchase bottled water after the water filtration system was installed.  Defendants deny the balance of the allegations contained in this paragraph because they are untrue.**

100.   Defendants' actions evidence an egregious infringement upon the fundamental constitutional and human rights of Plaintiffs.  Defendants knowingly forced Plaintiffs to drink contaminated water, denied them access to clean water, and ensured that Plaintiffs suffered severe and permanent injuries.

**ANSWER:**

**Denied for the reason it is untrue.**

101. Each Plaintiff herein has consumed lead-contaminated water, because of Defendants' actions and/or omissions. As a direct and proximate result of Defendants' actions and/or omissions, Plaintiffs have suffered injuries including, but not limited to, hair, skin, digestive, and organ problems; physical pain and suffering; disability; brain and developmental injuries including cognitive deficits; and aggravation of pre-existing conditions.

**ANSWER:**

**Denied for the reasons stated in answer to paragraph no. 2.**

## COUNT I
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (EIGHTH AMENDMENT - CRUEL AND UNUSUAL PUNISHMENT)
### (Against all Defendants)

102. Plaintiffs incorporate herein all the prior allegations.

**ANSWER:**

**Defendants restate their answers to the previous allegations.**

103. Pursuant to the Eighth Amendment to the United States Constitution, at all times relevant, Plaintiffs had the right to be free from cruel and unusual punishment while in the custody and control of Defendants Genesee County, Pickell and Gould.

**ANSWER:**

**Admitted.**

104. Notwithstanding duties to prevent the cruel and unusual punishment of Plaintiffs while under their custody and control, Defendants Genesee County, Pickell and

Gould knowingly subjected Plaintiffs to conditions posing and/or exacerbating a substantial risk of serious harm to them.

**ANSWER:**

**Denied for the reason it is untrue.**

105.  Defendants Genesee County, Pickell and Gould repeatedly and willfully failed to provide Plaintiffs with the public health conditions, namely clean water, that were necessary to avoid serious medical injuries.  Defendants Genesee County, Pickell and Gould repeatedly and willfully failed to provide Plaintiffs with clean water although they were on notice that the Genesee County Jail had contaminated water and that it would cause Plaintiff's serious medical injuries.  Defendants Genesee County, Pickell and Gould remained deliberately indifferent to Plaintiffs' wellbeing although they knew that in so doing, they were depriving Plaintiffs of basic needs and violating their constitutional rights.

**ANSWER:**

**Denied for the reason it is untrue.**

106.  Throughout Plaintiffs' incarceration, the failure to provide safe drinking water and/or the delay in providing safe drinking water by each and every Defendant constituted cruel and unusual punishment in violation of Plaintiff's Fourth, Eighth, and Fourteenth Amendment rights.

**ANSWER:**

**Denied for the reason it is untrue.**

107.    The acts and/or omissions by all Defendants were unreasonable and performed knowingly, deliberately, indifferently, intentionally, maliciously, and with gross negligence, callousness, and deliberate indifference to Plaintiffs' well-being.

**ANSWER:**

   **Denied for the reason it is untrue.**

108.    At all times relevant, the law and Plaintiffs' rights were clearly established, and Defendants' actions were not objectively reasonable, and they are not entitled to qualified immunity.

**ANSWER:**

   **Defendants admit that at the time referenced by Plaintiffs in their complaint, they had a clearly established right under the Eighth Amendment to be free from cruel and unusual punishment in jail.  Defendants deny the allegation that there was a clearly established right to water of a certain purity for the reason it is untrue.**

109.    Defendants Genesee County, Pickell and Gould adopted, promulgated, encouraged, condoned, and/or tolerated official customs, policies, practices, and/or procedures, including such for failing to train, discipline and/or supervise its employees/agents, which were the motivating force for the Defendants' conduct as described herein, such that the same also amounted to a deliberate indifference to Plaintiffs' well-being.

**ANSWER:**

**Denied for the reason it is untrue.**

110.   As a direct and proximate result of all of the above Defendants' conduct and/or failures to act, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits, lost earning capacity, aggravation of pre-existing conditions, contract damages and punitive damages.

**ANSWER:**

**Denied for the reason it is untrue.**

## COUNT II
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
## (FOURTH AND FOURTEENTH AMENDMENTS - CONSPIRACY)
## (Against all Defendants)

111.   Plaintiffs incorporate herein all the prior allegations.

**ANSWER:**

**Defendants restate their answers to the previous allegations.**

112.   Defendants Genesee County, Pickell and Gould conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among

themselves for the purpose of depriving, either directly or indirectly, Plaintiffs of the equal protections of laws and of their equal privileges and immunities under the law. As alleged above, Defendants have evidenced an animus against Plaintiffs.

**ANSWER:**

**Denied for the reason it is untrue.**

113.    Defendants Genesee County, Pickell and Gould's actions were under the color of law and evidence of reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

**ANSWER:**

**Defendants admit that they acted under color of law.  Defendants deny the balance of the allegations for the reason they are untrue.**

114.    As a direct and proximate result of all of the above Defendants' conspiracy, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits, lost earning capacity, aggravation of pre-existing conditions, contract damages and punitive damages.

**ANSWER:**

**Denied for the reason it is untrue.**


**WHEREFORE**, Defendants request that this case be dismissed with prejudice and

that they be awarded costs and attorney fees.

Dated: <u>October 18, 2018</u>                    <u>/s/ Michael Edmunds                    </u>
                                                Gault Davison, PC
                                                Attorney for Defendants
                                                G-8455 S. Saginaw St. Suite 2
                                                Grand Blanc, MI 48439
                                                (810) 234-3633
                                                Medmunds@EdmundsLawOffice.com
                                                P55748

## DEFENDANTS' AFFIRMATIVE DEFENSES

1.    Plaintiffs may have failed to mitigate their damages.

2.    Defendants have governmental immunity.

3.    Defendants Pickell and Gould have qualified immunity.

4.    Plaintiffs' conspiracy claim is barred by virtue of the intra corporate conspiracy doctrine, because Defendants Pickell and Gould were employed by Defendant Genesee County.

5.    Defendants reserve the right to amend or supplement this list of affirmative defenses.


Dated: October 18, 2018              */s/ Michael Edmunds*
                                     Gault Davison, PC
                                     Attorney for Defendants
                                     G-8455 S. Saginaw St. Suite 2
                                     Grand Blanc, MI 48439
                                     (810) 234-3633
                                     Medmunds@EdmundsLawOffice.com
                                     P55748

**<u>DEFENDANTS' RELIANCE UPON JURY DEMAND</u>**

Defendants hereby rely upon the jury demand previously made.

Dated: <u>October 18, 2018</u>          */s/ Michael Edmunds*
                                       Gault Davison, PC
                                       Attorney for Defendants
                                       G-8455 S. Saginaw St. Suite 2
                                       Grand Blanc, MI 48439
                                       (810) 234-3633
                                       Medmunds@EdmundsLawOffice.com
                                       P55748

**CERTIFICATE OF SERVICE**

I hereby certify that on October 18, 2018, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all attorneys of record.

Dated: October 18, 2018             /s/Michael W. Edmunds
                                    Gault Davison, PC
                                    Attorney for Defendants
                                    G-8455 S. Saginaw St. Suite 2
                                    Grand Blanc, MI 48439
                                    (810) 234-3633
                                    Medmunds@EdmundsLawOffice.com
                                    P55748